H. ROSENBLUM, INC., A NEW JERSEY CORPORATION, SUMMIT GIFT GALLERIES, INC., A NEW JERSEY CORPORATION (FORMERLY KNOWN AS SUMMIT PROMOTIONS, INC.), HARRY ROSENBLUM AND BARRY ROSENBLUM, PLAINTIFFS-APPELLANTS, v. JACK F. ADLER ... [AND 426 OTHER NAMED DEFENDANTS LISTED IN THE COMPLAINT], INDIVIDUALLY AND AS PARTNERS TRADING AS TOUCHE ROSS & CO., SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS-RESPONDENTS.

H. ROSENBLUM, INC., A NEW JERSEY CORPORATION, SUMMIT GIFT GALLERIES, INC., A NEW JERSEY CORPORATION (FORMERLY KNOWN AS SUMMIT PRODUCTIONS, INC.), HARRY ROSENBLUM AND BARRY ROSENBLUM, PLAINTIFFS-RESPONDENTS, v. JACK F. ADLER ... [AND 426 OTHER NAMED DEFENDANTS LISTED IN THE COMPLAINT], INDIVIDUALLY AND AS PARTNERS TRADING AS TOUCHE ROSS & CO., SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS-APPELLANTS.

Argued November 22, 1982—Decided June 9, 1983.

325

*Bradley R. Brewer,* a member of the New York bar, argued the cause for appellants and respondents H. Rosenblum, Inc., etc., et al. (*Cummins, Dunn & Pashman,* attorneys; *Donald Horowitz,* of counsel).

*Leon P. Gold,* a member of the New York bar, argued the cause for respondents and appellants Jack F. Adler, et al. (*Schneider, Schneider & Balt,* attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This case focuses upon the issue of whether accountants should be responsible for their negligence in auditing financial statements. If so, we must decide whether a duty is owed to those with whom the auditor is in privity, to third persons known and intended by the auditor to be the recipients of the audit, and to those who foreseeably might rely on the audit. Subsumed within these questions is a more fundamental one: to what extent does public policy justify imposition of a duty to any of these classes?

I

The issues herein arose on defendants' motion for partial summary judgment. The facts that follow were, therefore, adduced from the record in a light most favorable to the plaintiffs. The plaintiffs Harry and Barry Rosenblum brought this action against Touche Ross & Co. (Touche), a partnership, and the individual partners. Touche, a prominent accounting firm, had audited the financial statements of Giant Stores Corporation (Giant). These plaintiffs, allegedly relying on the correctness of the audits, acquired Giant common stock in conjunction with the sale of their business to Giant. That stock subsequently proved to be worthless, after the financial statements were found to be fraudulent. Plaintiffs claim that Touche negligently conducted the audits and that Touche's negligence was a proximate cause of their loss.

Giant, a Massachusetts corporation, operated discount department stores, retail catalog showrooms and art and gift shops. Its common stock was publicly traded, its initial public offering having been made pursuant to a registration statement filed

with the Securities and Exchange Commission (SEC) in 1969. Giant was required to file audited financial statements with the SEC as part of its annual report to stockholders and Touche conducted those audit examinations during the fiscal years 1969 through 1972. Giant's fiscal year was the twelve months ending January 30.

In November 1971 Giant commenced negotiations with the plaintiffs for the acquisition of their businesses in New Jersey (H. Rosenblum, Inc. and Summit Promotions, Inc.). These enterprises had retail catalog showrooms in Summit and Wayne. The merger negotiations culminated in an agreement executed on March 9, 1972. During the discussions two significant events occurred. First, on December 14, 1971, Giant made a public offering of 360,000 shares of its common stock. The financial statements included in the prospectus of that offering contained statements of annual earnings for four years ending January 30, 1971, as well as balance sheets as of January 30 for each of those years, which had been audited by Touche. Touche's opinion affixed to those financials stated that it had examined the statements of earnings and balance sheets "in accordance with generally accepted auditing standards" and that the financial statements "present[ed] fairly" Giant's financial position. Similar data had been incorporated in Giant's annual report for the year ending January 30, 1971. Second, Touche began its audit of Giant's financials for the year ending January 29, 1972. This audit was completed on April 18, 1972. The attached Touche opinion bore the same language affixed to the 1971 statements.

One of the Touche partners, Armin Frankel, was present at some of the merger discussions. It does not appear that he participated in the negotiations, though the plaintiffs assert that they received the January 1971 audited statements during a meeting at which Frankel was present. Although he denies making the projection, Frankel is also alleged to have stated during one meeting that the preliminary figures of the 1972 audit then under way indicated it was going to be "a very

strong year for Giant Stores, it is probably going to be the best in history . . . ."

The merger agreement provided that the Rosenblums would receive an amount of Giant stock, up to a maximum of 86,075 shares, depending upon the net income of their enterprises for their fiscal year ending December 31, 1971. The closing was to be scheduled between May 15 and May 31, 1972. Giant agreed that as of the closing it would represent and warrant that there had "been no material adverse change in the business, properties or assets of Giant and its Subsidiaries since July 31, 1971." The plaintiffs claim they relied upon the 1972 audited statements before closing the transaction on June 12, 1972. The Rosenblums received Giant common stock, which had been listed on the American Stock Exchange in February 1972 and was being traded on that Exchange when the merger was effected. After the Rosenblum closing, Giant made another public offering of common stock in August 1972. Touche furnished for this Giant registration statement the audited financial statements for each of the five fiscal years ending January 29, 1972, to which was affixed Touche's unqualified opinion.

Giant had manipulated its books by falsely recording assets that it did not own and omitting substantial amounts of accounts payable so that the financial information that Touche had certified in the 1971 and 1972 statements was incorrect.[1] The fraud was uncovered in the early months of 1973. Trading in Giant stock on the American Stock Exchange was suspended in April 1973 and never resumed. On May 22, 1973, Touche withdrew its audit for the year ending January 29, 1972. Giant filed a bankruptcy petition in September 1973. The Giant stock received by the plaintiffs in the merger had become worthless.

---

[1]The SEC found that Touche's audit for the 1972 statements did not meet the requirements of the accounting profession. The SEC entered a consent order of censure against Touche. *In re Touche Ross & Co.,* Securities Exchange Act Release No. 15978, *Fed.Sec.L.Rep.* (CCH) ¶ 72, 175A (1979).

The plaintiffs' four-count complaint, predicated on the audited financials for the years ending January 30, 1971 and January 29, 1972, charged fraudulent misrepresentation, gross negligence, negligence and breach of warranty. Touche moved for partial summary judgment. It sought to have the court dismiss the claims based on alleged negligence in making the audit for the year ending January 30, 1971 and on alleged negligence, gross negligence and fraud in making the audit for the year ending January 29, 1972. The trial court granted the motion with respect to the 1971 financials and denied it as to the 1972 financials.

The Appellate Division granted plaintiffs' motion for leave to appeal, but affirmed the trial court's dismissal of the negligence claim based on the 1971 audit. 183 *N.J.Super.* 417 (1982). We granted plaintiffs' motion for leave to appeal. 91 *N.J.* 191 (1982). The defendants had also moved for leave to appeal from the denial of their motion for partial summary judgment addressed to claims predicated on the 1972 financials. The Appellate Division had denied that motion. The defendants subsequently moved before us for leave to appeal from the Appellate Division's denial. We acceded to that motion after we had granted plaintiffs' motion for leave to appeal. Thus the propriety of the trial court's disposition of Touche's entire motion for partial summary judgment is now before us.

## II

An independent auditor is engaged to review and examine a company's financial statements and then to issue an opinion with respect to the fairness of that presentation. That report is customarily attached to the financial statements and then distributed by the company for various purposes. Recipients may be stockholders, potential investors, creditors and potential creditors. When these parties rely upon a negligently prepared auditor's report and suffer damages as a result, the question arises whether they may look to the auditor for compensation.

In other words, to whom does the auditor owe a duty? The traditional rule is that the auditor's duty is owed only to those with whom he is in privity or to those who are known beneficiaries at the time of the auditor's undertaking. This rule is commonly attributed to an opinion of Chief Judge Cardozo in *Ultramares v. Touche,* 255 *N.Y.* 170, 174 *N.E.* 441 (1931). A second rule has been expressed in Section 552 of the *Restatement (Second) of Torts.* Under the *Restatement,* liability is extended to a known and intended class of beneficiaries. For example, if the auditor knows that the report is to be prepared for bank borrowing, then his duty would run to the bank to whom the company delivered the opinion. A third rule is that the auditor's duty is owed to those whom the auditor should reasonably foresee as recipients from the company of the financial statements for authorized business purposes. *See JEB Fasteners v. Marks, Bloom & Co.* [1981] 3 *All E.R.* 289, 296.

A claim against the auditor is realistically one predicated upon his representations. Though the theory advanced here by the plaintiffs is directed to the service performed by accountants and thus is in the nature of malpractice, their claim can be viewed as grounded in negligent misrepresentation. In the complaint the plaintiffs seek recompense for economic loss from a negligent supplier of a service with whom the claimants are not in privity. It has generally been held with respect to accountants that imposition of liability requires a privity or privity-like relationship between the claimant and the negligent actor. We must examine a number of issues in order to determine whether we should so limit such actions in New Jersey.

First, we shall consider whether, in the absence of privity, an action for negligent misrepresentation may be maintained for economic loss against the provider of a service. This involves (1) a negligent misrepresentation, (2) in furnishing a service, (3) that results in economic loss, (4) to a person not in privity with the declarant.

Second, we shall determine what duty the auditor should bear to best serve the public interest in light of the role of the auditor in today's economy.

### III

■ Negligent misrepresentation is a legally sound concept. An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance. *Pabon v. Hackensack Auto Sales, Inc.,* 63 *N.J.Super.* 476 (App. Div.1960), presents an example of a valid physical damage claim predicated upon misrepresentation. The driver of an automobile sued the automobile dealer and manufacturer for damages sustained when his steering wheel locked and the automobile went out of control and struck a pole. A judgment of involuntary dismissal at the close of the plaintiff's case was reversed. One theory advanced by the plaintiff was based on the negligent representation made by the dealer that the steering characteristic plaintiff had encountered prior to the accident was not the result of any deficiency, but rather was normal. The Appellate Division observed that negligence might be inferred from the falsity of the representation. It commented:

A false statement negligently made, and on which justifiable reliance is placed, may be the basis for the recovery of damages for injury sustained as a consequence of such reliance. *Russell v. First National Stores,* 96 *N.H.* 471, 79 *A.2d* 573 *(Sup.Ct.*1951); *Restatement, Torts,* § 552, especially Illustration 2; 1 *Harper & James, supra,* § 7.6, *pp.* 545–51; *Prosser, supra,* § 88, *pp.* 541–45; 23 *Am.Jur., Fraud and Deceit,* § 126, *p.* 917; 65 *C.J.S. Negligence* § 20, *p.* 427. The statement need not be a factual report, but may consist of an expert opinion. Justification for the imposition of a duty of care upon the speaker is found in the respective positions of the one making the representation and the relying party, the former purporting to exercise the skill and competency compatible with his profession or calling, the latter openly placing his faith on such reputed skill. There must be knowledge, or reason to know, on the part of the speaker that the information is desired for a serious purpose, that the seeker of the information intends to rely upon it, and that if the information or opinion is false or erroneous, the relying party will be injured in person or property. [*Id.* at 497]

■ Recovery of economic loss, due to negligent misrepresentation by one furnishing a service, has long been permitted when

there existed a direct contractual relationship between the parties or when the injured third party was a known beneficiary of the defendant's undertaking. Thus, for example, in *Economy B. & L. Ass'n v. West Jersey Title Co.*, 64 *N.J.L.* 27 (Sup.Ct.1899), the plaintiff agreed to loan $3,000 to one Moore secured by a first mortgage on Moore's property, title to which was to be certified by a title insurance company. Moore advised the defendant title insurance company of his agreement and retained the defendant to make the search and certificate. Moore delivered the certificate to and obtained the loan from the plaintiff. The plaintiff was held to have a good cause of action against the certifying title company when it was discovered that the carelessly made title search had not disclosed a prior recorded mortgage.

Our case law, however, has been split on whether privity or a similar relationship is necessary in a suit against the supplier of a service for negligent misrepresentation causing economic loss.

*Kahl v. Love*, 37 *N.J.L.* 5 (Sup.Ct.1873), is probably the first reported New Jersey negligent misrepresentation case concerned with a service resulting in economic loss. Defendant was the Jersey City collector of taxes. Upon receiving the check of a landowner in payment of taxes, defendant gave the landowner a receipt in full. The land, the subject of these taxes, was sold to the plaintiff, who relied on the receipt as proof of payment of the taxes. The check was later dishonored and taxes were levied on the lands after the plaintiff acquired title. The plaintiff sued the collector for the damages suffered and obtained a judgment. The Supreme Court reversed, citing both the absence of a duty and the unreasonableness of the plaintiff's reliance. The Court assumed that the defendant knew that these receipts were used on the sale of land to establish that taxes were paid up. It held that a duty, arising from contract or otherwise, had to exist before liability could ensue. Chief Justice Beasley, writing on behalf of the Court, stated:

> Such a restriction on the right to sue for a want of care in the exercise of employments or the transaction of business, is plainly necessary to restrain the

> remedy from being pushed to an impracticable extreme. There would be no bounds to actions and litigious intricacies, if the ill effects of the negligences of men could be followed down the chain of results to the final effect.[2]  [*Id.* at 8]

A more recent lower court decision has held to the contrary. In *Immerman v. Ostertag,* 83 *N.J.Super.* 364 (Law Div.1964), the court stated that a notary public owes a duty to third persons who rely on his acknowledgment to refrain from acts or omissions that constitute negligence. *Immerman* accepted the proposition that "an acknowledgment-taking officer has a duty to refrain from acts or omissions which constitute negligence, a duty which he owes not only to persons with whom he has privity, but also to any member of the public who, in reasonable contemplation, might rely upon the officer's certification." 83 *N.J.Super.* at 369. This Court has approvingly cited *Immerman* as articulating the general rule with respect to notaries. *Commercial Union Ins. Co. v. Thomas-Aitken Constr. Co.,* 54 *N.J.* 76, 81 (1969).

Similarly, lack of privity has been held not to bar the liability of an independent contractor engaged to perform services for his negligent nonfeasance. *Gold Mills, Inc. v. Orbit Processing Corp.,* 121 *N.J.Super.* 370 (Law Div.1972). The court there observed:

> Such liability should exist when the contractor has undertaken performance, whether his negligent performance results from the doing of something which a reasonably prudent person would not have done or from the failure to do something which a reasonably prudent person would have done. So long as the privity rule is no longer viable in the area of tort liability there is no reason why a contractor should not have the same duties toward a stranger to the contract as any member of society to another, *i.e.,* to exercise due care to avoid injury to another's person or property. [*Id.* at 376]

We have never passed upon the problem of an accountant's liability to third persons who have relied on negligently audited

---

[2]Interestingly, Chief Justice Beasley found support for his holding in the strict privity requirements of products liability law. We consider below how changes in that field might lead one to a different conclusion.

statements to their economic detriment.[3] Many other jurisdictions have limited an accountant's liability to those with whom the accountant is in privity. The earliest decision in the United States our research has uncovered is *Landell v. Lybrand,* 264 *Pa.* 406, 107 *A.* 783 (1919), holding that an accountant was not liable for misstatements in a company's financial statements to a third person who had relied upon the financials and had purchased the company's stock. The leading opinion is that of Chief Judge Cardozo in *Ultramares v. Touche,* 255 *N.Y.* 170, 174 *N.E.* 441 (1931). In rejecting a claim against an accounting firm for a negligent audit relied upon by a third person who advanced credit to the firm's client, he wrote:

> If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences. [255 *N.Y.* at 179–80, 174 *N.E.* at 444]

Chief Judge Cardozo, like Chief Justice Beasley in *Kahl,* believed that imposition of this type of exposure would be an undue burden upon the declarants, when balanced against the functions they performed. In *Glanzer v. Shepard,* 233 *N.Y.* 236, 135 *N.E.* 275 (1922), Judge Cardozo had held liability did exist in favor of a third party when it was shown that the certification was made for the use of that third person. There a bean seller contracted with the defendant, a professional weigher, to weigh and certify a shipment of beans being sold to the plaintiff. The plaintiff's suit against the professional weigher was upheld because the weigher knew the certification was to be used by the plaintiff. *Ultramares* and *Glanzer* acknowledge the exist-

---

[3]*Cf. Coleco Industries, Inc. v. Berman,* 423 *F.Supp.* 275, 303 (E.D.Pa.1976), appeal on this issue dismissed as moot, 567 *F.*2d 569 (3d Cir.1977), *cert.* denied, 439 *U.S.* 830, 99 *S.Ct.* 106, 58 *L.Ed.*2d 124 (1978) (applying N.J. law) (concluding that lack of privity did not preclude a claim against accountants who knew that the claimants were to benefit from the audit).

ence of a duty only in favor of the person for whose "primary benefit" the statements were intended.

Many commentators have questioned the wisdom of *Ultramares* and *Glanzer*. *See, e.g.,* Wiener, "Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation," 20 *San Diego L.Rev.* 233 (1983); Besser, "Privity?—An Obsolete Approach to the Liability of Accountants to Third Parties," 7 *Seton Hall L.Rev.* 507 (1976); Marinelli, "The Expanding Scope of Accountants' Liability to Third Parties," 23 *Case W.Res.L.Rev.* 113, 117–22 (1971); Seavey, "Mr. Justice Cardozo and the Law of Torts," 52 *Harv.L.Rev.* 372, 398–404 (1939); Solomon, "*Ultramares* Revisited: A Modern Study of Accountants' Liability to the Public," 18 *DePaul L.Rev.* 56 (1968). Criticism of the primary benefit rule led in part to the adoption of Section 552 of the *Restatement (Second) of Torts,* which limited liability for negligent misrepresentation to the loss

> suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he [the auditor] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

When applied to an auditor, the *Restatement* limits the persons to whom he owes a duty to his client, to intended identifiable beneficiaries and to any unidentified member of the intended class of beneficiaries. The only extension in the *Restatement* beyond *Ultramares* and *Glanzer* appears to be that the auditor need not know the identity of the beneficiaries if they belong to an identifiable group for whom the information was intended to be furnished. There is a substantial split of authority among the courts, some following *Ultramares* and others adopting the *Restatement*. *See* Annot., "Liability of public accountant to third parties," 46 *A.L.R.3d* 979, 989 (1972).

Both *Ultramares* and the *Restatement* demand a relationship between the relying third party and the auditor. Unless some policy considerations warrant otherwise, privity should

not be, and is not, a salutary predicate to prevent recovery. Generally, within the outer limits fixed by the court as a matter of law, the reasonably foreseeable consequences of the negligent act define the duty and should be actionable.

We long ago discarded the requirement of privity in a products liability case based on negligence.[4] *See Martin v. Studebaker Corp.,* 102 *N.J.L.* 612, 614–15 (E. & A.1926). *Martin* approved Judge Cardozo's seminal opinion in *MacPherson v. Buick Motor Co.,* 217 *N.Y.* 382, 111 *N.E.* 1050 (1916). It is interesting to compare his language in *MacPherson* with his position in *Ultramares.* In *MacPherson* Cardozo wrote:

> The contractor who builds a scaffold invites the owner's workmen to use it. The manufacturer who sells the automobile to the retail dealer invites the dealer's customers to use it. The invitation is addressed in the one case to determinate persons and in the other to an indeterminate class, but in each case it is equally plain, and in each case its consequences must be the same [liability for negligence, regardless of the lack of privity].
>
> There is nothing anomalous in a rule which imposes upon A., who has contracted with B., a duty to C. and D. and others according as he knows or does not know that that the subject-matter of the contract is intended for their use. [111 *N.E.* at 1054]

It is clear that an action for negligence with respect to an injury arising out of a defective product may be maintained without privity. The negligence involved may be that ascribable to negligent misrepresentation.

In *Martin v. Bengue, Inc.,* 25 *N.J.* 359 (1957), we held that the plaintiff had a viable cause of action against the manufacturer of an ointment because the manufacturer's directions accompanying the product assured that the ointment could be safely used. The directions were misleading because they made no reference to the dangers of the flammability of the vapors

---

[4]Indeed, privity is not required for recovery in *strict* products liability in tort. *Santor v. A & M Karagheusian, Inc.,* 44 *N.J.* 52, 57 (1965); *Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358 (1960).

emitted. The directions contained a negligent misrepresentation upon which a viable cause of action could be predicated.

In *O'Donnell v. Asplundh Tree Expert Co.*, 13 *N.J.* 319 (1953), the plaintiff, a tree trimmer, fell and was injured when the hook securing his safety belt broke. The hook had been purchased by the plaintiff's employer from the defendant. The defendant had negligently represented to the employer that this safety hook was adequate to be used by tree trimmers as a safety hook or snap. In reversing the trial court's judgment of dismissal entered at the conclusion of the plaintiff's case, we referred to the careless misrepresentations of the defendant to the employer that the hooks were made of proper material, and stated that such representations "are a factor to be considered in determining the defendant's negligence." In *O'Donnell* we referred to and relied upon *Thomas v. Winchester*, 6 *N.Y.* 397 (1852), in which the New York Court of Appeals held that a manufacturer of drugs and medicines who carelessly labeled a deadly poison as a harmless medicine and sent it so labeled into the market was liable to those who were injured by using it.

These cases demonstrate that negligent misrepresentations referring to products may be the basis of liability irrespective of privity.[5] Damages for products liability have not been limited to physical injury. Recovery for economic loss has also been permitted. In *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52, 60 (1965), Justice Francis observed that

[f]rom the standpoint of principle, we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively-made product has caused personal injury, and not actionable when inadequate manufacture has put

---

[5]Consistent with its holding in *Henningsen,* this Court has permitted an action for failure to warn in a strict products liability case without privity. That failure could constitute the omission to state a material fact that would render the statement as made misleading. *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 243 (1981) (warning to be sufficient must communicate information essential to make the use of a product safe).

a worthless article in the hands of an innocent purchaser who has paid the required price for it.[6]

Why should a claim of negligent misrepresentation be barred in the absence of privity when no such limit is imposed where the plaintiff's claim also sounds in tort, but is based on liability for defects in products arising out of a negligent misrepresentation? If recovery for defective products may include economic loss, why should such loss not be compensable if caused by negligent misrepresentation? The maker of the product and the person making a written representation with intent that it be relied upon are, respectively, impliedly holding out that the product is reasonably fit, suitable and safe and that the representation is reasonably sufficient, suitable and accurate. The fundamental issue is whether there should be any duty to respond in damages for economic loss owed to a foreseeable user neither in privity with the declarant nor intended by the declarant to be the user of the statement or opinion.

## IV

There remains to be considered whether the public interest will be served by a proposition holding an auditor responsible for negligence to those persons who the auditor should reasonably foresee will be given the audit to rely upon and do in fact place such reliance on the audit to their detriment. Should there be such a duty imposed? Chief Justice Weintraub in *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583 (1962), explained the judicial analysis that must be made:

Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.

---

6 A number of jurisdictions have adopted the approach set forth in *Santor,* but permitting recovery in tort for·economic loss in such cases is not as yet the majority rule. See cases cited in *Pennsylvania Glass Sand v. Caterpillar Tractor Co.,* 652 *F.*2d 1165, 1171 n. 17 (3d Cir.1981) (applying Pennsylvania law). The leading case holding that economic loss is not recoverable is *Seely v. White Motor Co.,* 63 *Cal.*2d 9, 45 *Cal.Rptr.* 17, 403 *P.*2d 145 (1965).

See also *Suter v. San Angelo Foundry & Machine Co.,* 81 *N.J.* 150, 172–73 (1979); *Newmark v. Gimbel's Inc.,* 54 *N.J.* 585, 596–97 (1969) (stating that doctors and dentists should not be held to duty of strict liability because they furnish services essential to society that are so necessarily and intimately related to public health that their obligation ought to be expressed in a duty to exercise reasonable competence and care to their patients; that the importance of these services "outweighs in the [policy] scale any need for imposition . . . of the rules of strict liability in tort"); *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 75–76 (1966); 2 Harper & James, *Law of Torts* § 18.6, at 1052 (1956) (suggesting policy considerations involve balancing of several factors: "the burden [that the suggested duty] would put on defendant's activity; the extent to which the risk is one normally incident to that activity; the risk and the burden to plaintiff; the respective availability and cost of insurance to the two parties; the prevalence of insurance in fact; the desirability and effectiveness of putting the pressure to insure on one rather than the other, and the like").

The fairness of the imposition of a duty on accountants cannot be appraised without an understanding of the independent accountant's auditing function. It is particularly important to be aware of the independent auditor's role in order to assess the propriety of imposing any duty to those who may rely on the audit.

Accounting is the act of identifying, measuring, recording, and communicating financial information about an economic unit. W. Pyle & J. White, *Fundamental Accounting Principles* 1 (1972). It has been said that

*accountability* has clearly been the social and organizational backbone of *accounting* for centuries. Modern society and organizations depend upon intricate networks of accountability which are based on the recording and reporting of these activities. This process of accounting is essential to the proper functioning of society and organizations. Accounting, therefore, starts with the recording and reporting of activities and their consequences, and ends with the discharging of accountability. This basically describes accounting, at least if we attempt to interpret the existing practice rationally. We may, therefore, say

that *accountability is what distinguishes accounting* from other information systems in an organization or in a society. [Y. Ijiri, "Theory of Accounting Measurement," *Studies in Accounting Research* No. 10 (American Accounting Association) 32 (1975) (emphasis added)]

The company prepares the financial statements in the first instance. The independent auditor's role in the accountability process is to scrutinize management's accountability reports. Commission on Auditors' Responsibilities, American Institute of Certified Public Accountants, *Report, Conclusions and Recommendations* 1 (1978). The auditor must make such an examination so as to enable him to express an opinion on the fairness of the financial presentation in the statements. The professional standards of the American Institute of Certified Public Accountants express the auditor's function as follows:

The objective of the ordinary examination of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present financial position, results of operations, and changes in financial position in conformity with generally accepted accounting principles. [Statements on Auditing Standards, 1 AICPA, Professional Standards, § 110.01 (1972)] [7]

The auditor is concerned with generally accepted accounting principles, that is, acceptable assumptions, procedures and techniques for the preparation of financial statements. Dawson, "Auditor's Third Party Liability," 46 *Wash.L.Rev.* 675, 691 (1971). Auditing standards have been developed by the American Institute of Certified Public Accountants governing examination of statements and reporting as to whether generally accepted principles and practices have been followed. Statements on Auditing Standards, 1 AICPA, Professional Standards, § 110.01 (1972).

To perform these functions the auditor must, among other things, familiarize himself with the business, its operation and reporting methods and industry-wide conditions. It is necessary

---

[7]Similarly, the Securities and Exchange Commission requires that the auditor's examination be made in accordance with generally accepted auditing standards. As amended in Release No. AS–195, Reg. § 210.2–02, 41 *Fed.Reg.* 35479 (1976).

to understand the financial and accounting characteristics and practices of the enterprise. In short, the auditor must be so knowledgeable that he can render an "informed opinion."

There are certain limitations within the accounting framework. The proper accounting treatment of some matters may not be settled. For example, research and development might be written off immediately as an expense or capitalized and disposed of over a period of time. Similarly, there is considerable debate over the proper method for depreciating intangible assets. An auditor's review is subject to similar constraints because the financial statements cannot be more reliable than the underlying accounting methodology. The auditor must critically evaluate the accounting principles selected to measure performance, but some of the basic data upon which the auditor relies are not as a practical matter verifiable. The auditor is neither required to investigate every supporting document, nor deemed to have the training or skills of a lawyer or criminal investigator. Commission on Auditor's Responsibilities, American Institute of Certified Public Accountants, *Report, Conclusions and Recommendations* 45 (1978).

Nonetheless, the independent auditor should be expected to detect illegal or improper acts that would be uncovered in the exercise of normal professional skill and care. The auditor should exercise reasonable care in verifying the underlying data and examining the methodology employed in preparing the financial statements. The accountant must determine whether there are suspicious circumstances and, even in the absence of suspicious circumstances, make a reasonable sampling or apply some testing technique. Hawkins, "Professional Negligence Liability of Public Accountants," 12 *Vand.L.Rev.* 797, 805 (1959). This does not mean the auditor will always be able to discover material fraud. Yet the audit, particularly when it uncovers fraud, dishonesty, or some other illegal act, serves an undeniably beneficial public purpose.

At one time the audit was made primarily to inform management of irregularities and inefficiencies in the business. *See* Hallett & Collins, "Auditors' Responsibility for Misrepresentation: Inadequate Protections for Users of Financial Statements," 44 *Wash.L.Rev.* 139, 178 (1968); Comment, "Accountant's Liability for Negligence," 48 *Fordham L.Rev.* 401, 405 (1979). That function remains one of the principal reasons for the audit. Gradually a need for independent audits was generated by public ownership of business enterprises and by requirements of the stock exchanges [8] and the Securities and Exchange Commission (SEC).[9] Institutional investors, investment specialists, stockholders, and lenders demanded more and reliable information. It is now well recognized that the audited statements are made for the use of third parties who have no contractual relationship with the auditor. Moreover, it is common knowledge that companies use audits for many proper business purposes, such as submission to banks and other lending institutions that might advance funds and to suppliers of services and goods that might advance credit. The SEC twenty-five years ago stated: "The responsibility of a public accountant is not only to the client who pays his fee, but also to investors, creditors and others who may rely on the financial statements which he certifies." *In re Touche, Niven, Bailey & Smart,* 37 *S.E.C.* 629, 670 (1957). These uses as well as governmental requirements make financial statements reviewed by independent qualified accountants indispensable. Government has increasingly uti-

---

[8] *New York Stock Exchange Co. Manual* § A67–78, 24.13, 24.24.

[9] The Securities Act of 1933 requires that the prospectuses filed with respect to public offerings of securities include certified financial statements. 15 *U.S.C.A.* §§ 77g, aa (1981). Many companies must file an annual report, Form 10–K, containing certified financial statements within 90 or 120 days of the end of each fiscal year. The Securities Exchange Act of 1934 requires that independent certified financial statements be included in annual reports, which must be filed by almost all companies having assets of at least $1,000,000 and 500 holders of a class of equity securities. 15 *U.S.C.A.* § 78(1)(g)(1) (1981).

lized accounting as a means to control business activities. Some examples of such use are public utility rate regulation and regulation of banks and insurance companies. The SEC has emphasized accountability through disclosure, accomplished in part by examinations and reports of independent auditors under the Securities Act of 1933 and the Securities Exchange Act of 1934.

In *In re Kerlin,* SEC Accounting Release 105 (1966), the Securities and Exchange Commission observed:

> A public accountant's examination is intended to be an independent check upon management's accounting of its stewardship. Thus he ha[s] a direct and unavoidable responsibility of his own, particularly where his engagement relates to a company which makes filings with the Commission or in which there is substantial public interest.

The auditor's function has expanded from that of a watchdog for management to an independent evaluator of the adequacy and fairness of financial statements issued by management to stockholders, creditors, and others. Broad, "The Progress of Auditing," 100 *J. Accountancy* 38, 38–39 (1955); Hallett & Collins, "Auditors' Responsibility for Misrepresentation," 44 *Wash.L.Rev.* 139, 178 (1968).

The changing function of an independent public accountant has been described as follows by J. Carey, one-time executive director of the American Institute of Accountants, in *Professional Ethics of Public Accounting* (1946) at 13–14:

> Whenever he certifies a financial statement the certified public accountant is potentially, at least, rendering a service to two or more parties whose interests may come into conflict—management and stockholder, borrower and lender, purchaser and seller. He may, and often does, serve simultaneously competitors in the same line of business, without fear on the part of either client that he will favor the one or the other. It is the peculiar obligation of the certified public accountant, which no other profession has to impose on its members, to maintain a wholly objective and impartial attitude toward the affairs of the client whose financial statements he certifies. The certified public accountant acknowledges a moral responsibility (and under the Securities Act this is made a legal and financial responsibility) to be as mindful of the interests of strangers who may rely on his opinion as of the interests of the client who pays his fee. This is at the same time a heavy burden and a proud distinction. It marks the certified public accountant as an individual of the highest integrity; a tough-minded technician whose judgment cannot be unbalanced by the strongest pressures,

who stakes a hard-earned professional reputation on his ability to express a fair and just opinion on which all concerned may rely; in the broad sense, a highly useful servant to society as a whole.

... The certified public accountant, therefore, in providing accounting statements which all concerned may accept as disinterested expressions, based on technically sound procedures and experienced judgment, may serve as a kind of arbiter, interpreter, and umpire among all the varied interests. Thereby he can eliminate the necessity for costly separate investigations by each party at interest, as well as endless doubts, delays, misunderstandings, and controversies which are so much sand in the economic machine. [Quoted in *In re Touche, Niven, Bailey & Smart*, 37 *S.E.C.* 629, 671 (1957)]

The two most important qualities of the auditor are the expertise that he brings to the project and the independence with which he performs his task. *See* Wixon & Kell, *Accountants' Handbook* 28.1 (4th ed. 1956). The auditor is not only labeled as independent, but also is expected to be independent in fact. The public accountant must report fairly on the facts whether favorable or unfavorable to the client. *See* 82 *J. Accountancy* 449, 453 (1946). It is generally in management's interest that the financial statements reflect performance in the most favorable light. There is an inherent divergence of interests between management and third persons who will rely upon these statements. Without the auditor's oversight, management might be tempted to tilt certain items in its favor or to commit outright misrepresentation.

The Legislature has expressed its concern for the competence of accountants by enacting the Public Accounting Act of 1977, which requires that public accountants be certified or registered upon fulfilling certain standards. *N.J.S.A.* 45:2B–1 to –37. The declared legislative purpose of the Act is

to promote the dependability of information which is used for guidance in financial transactions or for accounting for or assessing the status or performance of commercial and noncommercial enterprises, whether public or private. The public interest requires that persons attesting, as experts in accounting, to the reliability or the fairness of presentation, of such information be qualified in fact to do so; that a public authority competent to prescribe and assess the qualifications of public accountants be established; and that the attestation of financial information by persons professing expertise in accounting be reserved to persons who demonstrate their ability and fitness to observe and apply the standards of the accounting profession. [*N.J.S.A.* 45:2B–2]

The objection to imposing a duty on accountants to third persons to whom the statements have been given by the company for proper business purposes is the spectre of financial catastrophe. It is feared that the unknown costs will be so severe that accounting firms will not be able to absorb the losses that will be visited upon them, particularly because in all likelihood the audited clients will be judgment proof or unable to satisfy their share of the indebtedness due. The reasonableness of this concern is questionable.

Many who would benefit from the rule that an auditor owes a duty of reasonable care to those to whom the company may foreseeably deliver the audit are now protected. Accounting firms are presently liable to purchasers of securities in public offerings when they have misstated a material fact in the financial statements. Securities Act of 1933, 15 *U.S.C.A.* § 77k (1981). It is interesting to compare the elements constituting liability under the Securities Act of 1933 with the traditional negligence (non-privity) standard. Accountants' liability under Section 11 is often available where an action for ordinary negligence would not succeed. Under section 11 the plaintiff need not prove scienter, negligence, or proximate cause; the burden of proof is on the accountants to establish freedom from negligence or "due diligence." *See generally Herman & MacLean v. Huddleston,* —— *U.S.* ——, ——, 103 *S.Ct.* 683, 687, 74 *L.Ed.2d* 548, 555 (1983). Section 18 of the Securities Exchange Act of 1934 creates a civil liability for any person who causes a misleading statement to be made in any report filed with the SEC under the 1934 Act. 15 *U.S.C.A.* 78r. The plaintiff must prove reliance and the defendant is not responsible if "he acted in good faith and had no knowledge that such statement was false or misleading." Under those statutes privity is not a defense and accountants may have substantial liabilities to third persons. *Escott v. Bar Chris Construction Corp.,* 283 *F.Supp.* 643 (S.D.N.Y.1968) (auditor liability under Section 11 of Securities Act of 1933); *Fischer v. Kletz,* 266 *F.Supp.* 180 (S.D.N.Y.1967) (auditor liability under Section 18 of the Securities Exchange

Act); *see generally, Ernst & Ernst v. Hochfelder,* 425 *U.S.* 185, 207–11, 96 *S.Ct.* 1375, 1387–89, 47 *L.Ed.2d* 668, 684–87 (1976).[10] Even under the rule of *Ultramares* accounting firms are liable, irrespective of privity, to all third persons for fraud and gross negligence that raises an inference of fraud. *Ultramares,* 174 *N.E.* at 448–49; *see also Merit Ins. Co. v. Colao,* 603 *F.2d* 654, 657–58 (6th Cir.1979) (applying Illinois law), *cert.* denied, 445 *U.S.* 929, 100 *S.Ct.* 1318, 63 *L.Ed.2d* 763 (1980); *State Street Trust Co. v. Ernst,* 278 *N.Y.* 104, 112, 15 *N.E.2d* 416, 418–19 (1938); *Duro Sportswear v. Cogen,* 131 *N.Y.S.2d* 20 (1954), aff'd, 285 *App.Div.* 867, 137 *N.Y.S.2d* 829 (1955).

Independent auditors have apparently been able to obtain liability insurance covering these risks or otherwise to satisfy their financial obligations. We have no reason to believe that they may not purchase malpractice insurance policies that cover their negligent acts leading to misstatements relied upon by persons who receive the audit from the company pursuant to a proper business purpose.[11]

---

[10]Proof of intent to deceive or defraud is also the primary element necessary for liability under section 10(b) of the Securities Exchange Act of 1934, 15 *U.S.C.A.* 78j(b). *See Herman & MacLean v. Huddleston,* —— *U.S.* at ——, 103 *S.Ct.* at 688, 74 *L.Ed.2d* at 556. An accountant can be held liable for the same conduct under section 10(b) and under section 11 of the 1933 Act. *Id.* —— *U.S.* at ——, 103 *S.Ct.* at 690, 74 *L.Ed.2d* at 559.

[11]Accountants have been able to obtain insurance covering their liability under the securities laws. While such liability is imposed under different circumstances, it is often easier to establish and can be similar in amount to that imposed here.

In 1976, a survey taken by the Practicing Law Institute indicated that accounting firms had little difficulty in obtaining insurance at a reasonable cost. One insurance plan is "sponsored monthly by the American Home Insurance Company and the Federal Insurance Company, the American Home writing the initial coverage, with the Federal taking the excess coverage." Practicing Law Institute, Tax Law and Practice. Transcript Series, No. 4, Accountants' Liability (J. McCord ed. 1969). Moreover, a new insurance program sponsored by AICPA covers all claims against the insured including defense costs, except those involving intentional fraud. *See* Levine & Marks, *Accountants' Liability Insur-*

The imposition of a duty to foreseeable users may cause accounting firms to engage in more thorough reviews. This might entail setting up stricter standards and applying closer supervision, which should tend to reduce the number of instances in which liability would ensue. Much of the additional costs incurred either because of more thorough auditing review or increased insurance premiums would be borne by the business entity and its stockholders or its customers.

The extent of financial exposure has certain built-in limits. The plaintiffs would have to establish that they received the audited statements from the company pursuant to a proper company purpose, that they, in accordance with that purpose, relied on the statements and that the misstatements therein were due to the auditor's negligence and were a proximate cause of the plaintiff's damage.[12] The injured party would be limited to recovery of actual losses due to reliance on the misstatement.[13] Negligence of the injured party could bar or limit the

---

ance—*Perils and Pitfalls,* J. Accountancy, Oct. 1976, at 59, 60. The accountant is insured for liabilities up to five million dollars, and the plan is designed for firms with staffs of less than 250 people. Rollins Burdick Hunter, AICPA Professional Liability Insurance Plan (1979) (on file with *Fordham Law Review*). Like all insurance policies, these liability policies offer the accounting profession the advantage of risk-spreading. [*48 Fordham L.Rev.* at 415, n. 81]
*See also* 5 *Nat'l L.J.* 1 (1983).
   At oral argument defendants contended that the cost of insurance to cover the claims of all foreseeable users of audits would be catastrophic. Suffice it to say that defendants have not alerted us to data either within or outside the record to support this position.

   [12]In *Toromont Industrial Holdings Ltd. v. Thorne, Gunn, Helliwell & Christenson* [1976] 62 *D.L.R.*(3d) 225, [1976] 73 *D.L.R.*(3d) 122, the Ontario High Court found that the negligent audit was not the cause of the plaintiffs' take-over bid, that is, that the plaintiffs would have made the purchase anyway. The Ontario Court of Appeals found that the negligent audit had damaged the plaintiffs to the extent that they were forced to incur the cost of preparing a new audit.

   [13]It is the actual loss suffered, not the benefit of the bargain, that the plaintiff may gain as recovery. *See Scott Group Ltd. v. McFarlane* [1978] 1

amount of recovery under the Comparative Negligence Act. *N.J.S.A.* 2A:15–5.1. The accounting firm could seek indemnification or contribution from the company and those blameworthy officers or employees. The auditors could in some circumstances, such as when auditing a privately owned company, expressly limit in their certificates the persons or class of persons who would be entitled to rely upon the audit. Some commentators recognize that a "factor which may limit the foresight of reasonable reliance is the presence of a disclaimer of responsibility attached to the information." Stanton & Dugdale, "Recent Developments in Professional Negligence—II: Accountant's Liability to Third Parties," 132 *New L.J.* 5 (1982). *See also Hedley Byrne & Co. v. Heller Partners* [1964] AC 54, [1963] 2 *All E.R.* 575 (holding disclaimer was effective). In the final analysis the injured party should recover damages due to an independent auditor's negligence from that auditor. This would shift the loss from the innocent creditor or investor to the one responsible for the loss. Accountants will also be encouraged to exercise greater care leading to greater diligence in conducting audits. *See* 44 *Wash.L.Rev.* at 177 (stating that "[a]lthough courts may be the poorest forum in which to formulate standards, civil liability is probably the most effective means . . . of providing a sufficient incentive for the profession to undertake further self-regulation").

Similar thoughts were expressed in *Rusch Factors, Inc. v. Levin:*

Why should an innocent reliant party be forced to carry the weighty burden of an accountant's professional malpractice? Isn't the risk of loss more easily distributed and fairly spread by imposing it on the accounting profession, which can pass the cost of insuring against the risk onto its customers, who can in turn pass the cost onto the entire consuming public? Finally, wouldn't a rule of foreseeability elevate the cautionary techniques of the accounting profession? For these reasons it appears to this Court that the decision in *Ultramares*

N.Z.L.R. 553 (opinion of Cooke, J.) [New Zealand]; *West Coast Finance Ltd. v. Gunderson, Stokes, Walton & Co.* [1974] 44 D.L.R.(3d) 232, [1975] 56 D.L.R.(3d) 460 [Canada].

constitutes an unwarranted inroad upon the principle that "[t]he risk reasonably to be perceived defines the duty to be obeyed." *Palsgraf v. Long Island R.R.,* 248 *N.Y.* 339, 344, 162 *N.E.* 99, 100, 59 *A.L.R.* 1253. [284 *F.Supp.* 85, 91 (D.R.I.1968) (applying Rhode Island law) (dictum)]

Recently Justice Wiener, in his article "Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation," concluded:

The time has come to absolve the negligent accountant of this anachronistic protection. Accountant liability based on foreseeable injury would serve the dual functions of compensation for injury and deterrence of negligent conduct. Moreover, it is just and rational judicial policy that the same criteria govern the imposition of negligence liability, regardless of the context in which it arises. The accountant, the investor and the general public will in the long run benefit when the liability of the certified public accountant for negligent misrepresentation is measured by the foreseeability standard. [20 *San Diego L.Rev.* 233, 260 (1983)]

When the independent auditor furnishes an opinion with no limitation in the certificate as to whom the company may disseminate the financial statements, he has a duty to all those whom that auditor should reasonably foresee as recipients from the company of the statements for its proper business purposes, provided that the recipients rely on the statements pursuant to those business purposes.[14] The principle that we have adopted applies by its terms only to those foreseeable users who receive the audited statements from the business entity for a proper business purpose to influence a business decision of the user, the audit having been made for that business entity. Thus, for example, an institutional investor or portfolio manager who does

---

[14]A similar thought was expressed by Judge Woolf in *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 *All E.R.* 289, 296 [Queen's Bench, England], who endorsed the view that auditors should be liable to those who foreseeably and reasonably rely on their representations of the financial position of the audited entity.

Judge Woolf agreed with another jurist who found it "paradoxical that no duty of care should be owed to those who can be foreseen likely to sustain damage if carelessness existed, but that a duty of care should be owed to those, their clients, in respect of whom there is no foreseeable risk of damage" when the defalcation is due in the first instance to the client. *Id.* at 296.

not obtain audited statements from the company would not come within the stated principle. Nor would stockholders who purchased the stock after a negligent audit be covered in the absence of demonstrating the necessary conditions precedent. Those and similar cases beyond the stated rule are not before us and we express no opinion with respect to such situations.

Certified financial statements have become the benchmark for various reasonably foreseeable business purposes and accountants have been engaged to satisfy those ends. In those circumstances accounting firms should no longer be permitted to hide within the citadel of privity and avoid liability for their malpractice. The public interest will be served by the rule we promulgate this day.

## V

### A. The 1971 Audit

Both the trial court and the Appellate Division ruled that the plaintiffs' claim based on negligent preparation of the 1971 audit could not be sustained because the accountants were not aware at the time the audit was prepared of the existence of the plaintiffs or of a limited class of which the plaintiffs were members. The defendant's audit had been completed on April 16, 1971 and Giant's merger discussions with the plaintiff did not begin until the following September.[15] Therefore the defendants had no knowledge of the Rosenblums or the prospective merger at the time of the preparation of the audit and there could be no liability under *Ultramares* or the *Restatement.*

It may be contended under one view of the evidence that the defendants knowingly permitted and authorized plaintiffs' use of the 1971 audit. In doing so, they were aware that the plaintiffs would rely on that audit. Under these circumstances,

---

[15]The same audit report was used in the prospectus and registration statement covering 360,000 shares of Giant common stock offered on December 14, 1971.

the defendants implicitly represented to the plaintiffs, as they had represented in their certificate to Giant, that defendants had examined the 1971 statements of earnings and balance sheet "in accordance with generally accepted auditing standards" and that the financial statements "present[ed] fairly" Giant's financial position. There is evidence that the plaintiffs relied on these financial statements. It was also reasonably inferable that the audit had been made carelessly and negligently, resulting in false statements and in the plaintiffs' loss.

Defendants' presence and participation in the merger proceedings were not gratuitous. Any representations were made by defendants on behalf of their client Giant. Liability would be sustainable under the traditional rationale of *Glanzer v. Shepard, supra,* and *Economy B. & L. Ass'n v. West Jersey Title Co., supra.*

However, the facts supporting this position are somewhat attenuated. We are not unmindful that *R.* 4:46–2 provides that summary judgment shall be entered when "there is no genuine issue as to any material fact challenged." Implicated is the policy consideration that "protection is to be afforded against groundless claims" to save the expenses of protracted litigation and "reserve judicial manpower and facilities." *Robbins v. Jersey City,* 23 *N.J.* 229, 241 (1957); *see also United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co.,* 74 *N.J.* 92, 99 (1977). We therefore deem it appropriate to apply the somewhat broader principle enunciated above because the trial court may be faced with this issue at the trial. In adopting that position we are aware of the observation of Chief Justice Weintraub in *Busik v. Levine,* 63 *N.J.* 351, 363, appeal dismissed for want of substantial federal question, 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.* 2d 733 (1973), that "[w]hether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public." *See also Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 502 (1974).

When the defendants prepared the Giant audit, they knew or should have known that Giant would probably use the audited figures for many proper business purposes. They knew that it was to be incorporated in Giant's annual report, a report that would be transmitted to each Giant stockholder, and would be filed with the SEC in conjunction with Giant's proxy solicitation material for its annual stockholder meeting.[16] The defendants also knew or should have known that the audited financial statements would be available and useful for other proper business purposes, such as public offerings of securities, credit, and corporate acquisitions. These were clearly foreseeable potential uses of the audited financials at the time of their preparation. Giant and the defendant auditors knew that these financial statements would be used at least until the next financial statements had been audited and released.

Defendants became aware of plaintiffs' existence and their intended use of these statements before the plaintiffs relied on the accuracy of these financials. The defendants knew that the merger agreement included a representation that the prospectus used for the public offering in December 1971 contained no untrue statement of a material fact and did not omit to state any material fact. The defendants knew that this prospectus included their opinion that the financials had been prepared in accordance with generally accepted accounting principles and fairly presented Giant's financial condition. The defendants' representations were of a continuing nature and their obligation was a continuing one. *See Fischer v. Kletz,* 266 *F.Supp.* 180 (S.D.N.Y.1967) (accountants discovering inaccuracy after audit was released held under duty to disclose after-acquired information).

---

[16]The audit was necessary in conjunction with the SEC Form 10–K. This had to be filed within 90 or 120 days after the end of Giant's fiscal year on January 30, 1971.

■ Defendants' ignorance of the precise use to which the statements would be put does not eliminate their obligation. Applying the principle previously stated, we find first that it is necessary only that Giant, the entity for whom the audit was being made, used it for a proper business purpose. There was no limitation in the accountants' opinion. They could reasonably expect that their client would distribute the statements in furtherance of matters relating to its business. Having inserted the audit in that economic stream, the defendants should be responsible for their careless misrepresentations to parties who justifiably relied upon their expert opinions.

■ On the motion for summary judgment the facts viewed favorably from the plaintiffs' perspective are that the defendants negligently prepared their audit of Giant's financial statements reflecting Giant's operations for the twelve months ending January 30, 1971 and its financial status on that date. These statements were subsequently delivered by Giant, in furtherance of its business, to the plaintiffs for their consideration in determining whether to sell their enterprises to Giant, whether to accept Giant stock and how much stock to seek. Indeed, the defendants became aware of the fact that these financials had been delivered to the plaintiffs in connection with the proposed merger. The plaintiffs, allegedly relying upon the defendants' express representations, entered into the merger agreement which was subsequently consummated. As a result, plaintiffs claim to have suffered damages. Under these circumstances, the courts below erred in striking the cause of action predicated on the negligent auditing of the financial data for the year ending January 30, 1971.

## B. The 1972 Audit

■ The trial court denied defendants' motion to dismiss the plaintiffs' claims of fraud and negligence ascribable to the 1972 audit. The defendants contend that the plaintiffs had already signed and were bound by the merger contract executed on

March 9, 1972 at the time the audit was issued in April 1972. Therefore, the defendants argue that there could be no causal relationship between defendants' alleged fraud and negligence and the plaintiffs' damage. However, the merger agreement contained a Giant representation and warranty that there would be no material adverse change in its business, property or assets at the time of the closing. We cannot say on this record that disclosures of the true Giant situation exposed by a non-negligent audit would not have justified the plaintiffs' refusal to consummate the deal. There is a factual dispute over whether the plaintiffs relied on the 1972 audit. We do note that there is evidence in the depositions that the plaintiffs expected to receive the 1972 audited figures before the closing and would have refused to consummate the transaction if these data had reflected a material adverse change in Giant's business. Moreover, adequate disclosures might have exposed a fraud on the part of Giant that would have justified rescission of the contract. A contractual obligation alone does not require one to close a financially disastrous transaction when valid grounds exist to disavow the contract.

Irrespective of whether the defendants had actual knowledge of Giant's proposed use of the 1972 audit in connection with the merger, it was reasonably foreseeable that Giant would use the audited statement in connection with the merger and its consummation. This is particularly so since the defendants were familiar with the merger agreement and had been engaged by Giant to audit the books and records of the plaintiffs' enterprises for the purpose of the merger. The trial court properly denied defendants' motion.

The judgment granting defendants' motion for partial summary judgment with respect to the 1971 financial statements is reversed and that denying defendants' motion for partial summary judgment with respect to the 1972 financial statements is affirmed. The cause is remanded to the trial court for further proceedings consistent with this opinion.

358

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance* —None.