CROSBY *et al. v.* BURGE.

(In Banc. April 14, 1941. Suggestion of Error Overruled, May 26, 1941.)

[1 So. (2d) 504. No. 34458.]

Parker & Morse, of Poplarville, for appellants.

742

Hathorn & Williams, of Poplarville, for appellee.

Argued orally by **J. M. Morse**, for appellants, and by **E. B. Williams**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

Appellee, as plaintiff in the lower court, obtained a judgment, upon a jury verdict, for ten thousand dollars against appellants, as defendants there, for injuries to a testicle resulting from being struck thereon by the handle of a plow then being used by appellee, an employee of appellants. From this verdict and judgment appellants appeal.

The declaration charged that the injury was the result of negligence on the part of the appellants, in that they furnished to appellee an unsafe horse and a defective plow with which to do his work. But the case was tried and submitted to the jury, under plaintiff's instructions, on the theory only of an unsafe horse; and since we cannot see how the defects in the plow, if they existed, could have produced the injury, as detailed in the evidence, we consider in this opinion only the question of the unsafe horse.

It is charged that the horse was wild and unruly, and the particular trait of which complaint is made was a

tendency to jump, or jerk, when struck or touched in the side, or when a line got under his tail.

Appellee began working for appellants on November 6, 1939. He was furnished a team of mules and a twelve-inch steel-beamed turning plow. He began plowing in cut-over land which had been planted to tung trees after the pine timber had been removed therefrom. Shortly thereafter he and one McDonald, a negro, mutually exchanged teams, appellee getting in the exchange a team consisting of this horse and a mule, each party keeping his plow. He plowed with his new team until the accident occurred November 30, 1939.

The land had been plowed the year before, but it seems that when the accident occurred appellee was plowing a new furrow on the outer edge of the formerly plowed ground. He described the circumstances of the accident in the following testimony:

"Tell the court and jury what you were doing on the day you got hurt and how you got hurt?

"I was plowing on a hillside, and there was a bank there three or four feet high, or something like that, and I had the mule on that place. There was a narrow lot between this cut and the row of trees and it hadn't been plowed out very wide. I had my mule on this place to keep the single-tree from skinning the trees . . .

"Did you try to keep the single-tree from skinning the trees?

"Yes, sir.

"All right, go ahead.

"Well, the mule stepped off of that bank and it hit the horse and . . .

"Why did you have the mule on the bank, Mr. Burge?

"Holding him off the tung oil trees.

"All right, go ahead.

"The horse jumped.

"How hard did the horse jump?

"His best.

"What happened to you and the plow when the horse jumped?

"When he jumped the handles come apart and the plow hit the stump and the plow handle hit me right in the privates.

"What hit the stump?

"The point of the turning plow.

"You say the plow handles came apart?

"Yes, sir.

"And that jerked you forward . . .?

By Mr. Morse: "We object to that—it's leading." (Sustained).

"Well, what happened to you?

"I fell.

"What happened to you when the horse jumped and the point of the plow hit the stump?

"The handle hit me in the privates.

"What part of your privates, Mr. Burge?

"I believe you call it the testicles.

"Did it hit you hard?

"Yes, sir.

"What did you do after you got hit?

"I fell over on the ground and laid there and rolled.

"How long did you stay there?

"Ten or fifteen minutes."

That was Thursday. He continued to plow that day. He did not plow Friday because of rain. He plowed Saturday and part of Monday, quitting, he says, because of his injury.

The first question presented is whether, under this record, the proof shows that this was not a reasonably safe horse for this work. The master is under no duty to furnish a safe horse. He is not an insurer. Mississippi Law Journal, Vol. XI, No. 4, footnote 29, page 344; Harvey et al. v. Smith (Miss.), 198 So. 739; Wilson & Co. v. Holmes, 180 Miss. 861, 177 So. 24; Gulf Refining Co. v. Williams, 183 Miss. 723, 185 So. 234; New Orleans & N. E. R. Co. v. Penton, 135 Miss. 571, 100 So. 521; Brown v.

Coley, 168 Miss. 778, 152 So. 61; 3 C. J. S., Animals, Sec. 149, p. 1253. But he is under the duty to exercise reasonable care to furnish his servant with a team reasonably safe for use in doing the work required to be done by the servant. Central Lbr. Co. v. Porter, 139 Miss. 66, 103 So. 506, 42 A. L. R. 221; Farmer v. Cumberland Telephone & Telegraph Co., 86 Miss. 55, 38 So. 775; E. L. Bruce Co. v. Brogan, 175 Miss. 208, 166 So. 350.

Appellee's proof as to the character of the horse was made by himself; Travis Dunston, a negro; one, Tyner, father-in-law of appellee; and Roy Johnson, a negro.

While some of these witnesses use the expression, "wild horse," their testimony, boiled down and reduced to details, and fairly interpreted, shows that the horse would jump or jerk when struck or touched in the side by a brush or bush or some other object, and when a line got under his tail. A fair sample of this testimony was that given by the witness, Roy Johnson, who at the time of the trial was farming for a first cousin of the appellee. We quote his testimony:

"Well, state what the condition of the horse was.

"Well, the horse he was plowing wasn't what you'd say a real gentle horse.

"What do you mean by that?

"I'd call it kinder wild.

"What did he do to make you think he was kind of a wild horse?

"He was kinder touchous. Everything that touched him made him jump.

"When what would touch him?

"A bush or something like that.

"When a bush would touch him you say he'd jump;— how would he jump?

"He wouldn't make a hard jump but he would jump all right."

There is something said of the necessity for using a "twister" on the nose of this horse, but it is shown that this was when he was being broken to work, some three

to four years previously, which is not an unusual necessity in breaking horses.

On the other hand, it is shown that for about two years prior to the trial of this case this horse had been used in the same kind of work. He had been worked by a number of different people. Not one of those who had worked him told of any misbehavior on the part of the horse; but those who did testify said he was gentle and a fine work horse. It appears that appellee himself plowed this horse about two weeks before he claims to have made any complaint about him. It cannot be said that a horse is not reasonably safe to plow merely because he will flinch, jerk or jump when touched or struck in the side by a brush or switch, or other such instrument, or when a line gets under his tail. It is common knowledge that most horses will do that, and the "courts . . . take judicial notice of the character and habits of domestic animals." State v. Widman, 112 Miss. 1, 72 So. 782, 783. It is common knowledge that any horse, regardless of how gentle he may be, is likely to jump or lunge forward when his companion animal falls or hits against him from a three or·four foot embankment. This is not proof that the horse is wild or unfit for use.

In considering whether the master has used reasonable care, all the surrounding circumstances should be considered. E. L. Bruce Co. v. Brogan, supra. It is pertinent in this connection to state that appellee was a man fifty-three years of age; he had had many years of experience in this kind of work; he was familiar with cut-over lands; he knew that such lands have stumps above and below the ground and many underground roots, and that a plow is likely to strike unexpectedly at any time against these objects. Any man who has plowed in cut-over land, or new ground, knows that he is likely to be struck by the handle of a plow, regardless of what kind of team is being used, or the care and precaution he may exercise. These underground roots and stumps cannot be seen. The very process of plowing the ground involves the

inherent danger that the plow may strike one of these objects. While it was the duty of appellants to furnish reasonably safe instruments for doing the work, considering all the surrounding circumstances, yet the appellee assumed the usual, ordinary, inherent and natural risks incident to the work he was doing. Brown v. Coley, supra; Bailey, Personal Injuries (2 Ed.), Vol. II, p. 971, Sec. 367.

Again, to hold appellants liable appellee must show that the negligence of appellants was the direct proximate cause of his injury. Labatt's Master and Servant (2 Ed.), Vol. IV, Sec. 1520. It is not claimed that the horse was struck by a bush or stick, or that he got his tail over a line, causing him to jump. What was the direct, proximate, moving legal cause of the injury? Proximate cause has been defined as "the active and efficient cause that sets in motion a train of events which bring about a result without the intervention of any force started and working actively from a new and independent source." 50 C. J. 839. Was it the placing of the mule upon the embankment, or the sudden stepping of the mule from the embankment, striking the horse, or the jump of the horse, or the striking of the plow against the underground root of the stump? Appellee had complete control and charge of the manner of doing the work. He placed the mule upon the embankment. This, at least, started the chain of events. Here was the mule, three or four feet higher than the horse. He was hitched to the plow. When he came off that embankment he necessarily lunged and changed his course. This, alone and of itself, would naturally jerk the plow and, likely, change its course, causing a handle to strike the plowman.

The entire circumstances, viewed in the light of common experience and common sense, under applicable rules of law, fail to fasten upon appellants, with that degree of certainty and definiteness required by law, legal liability in this case. The peremptory instruction requested by appellants should have been given.

We might add that from this record it is extremely doubtful whether appellee's condition resulted from this accident or another cause.

The judgment is reversed and judgment rendered here for appellants.

Reversed and rendered.