514 So.2d 315 (1987)
TOUCHE ROSS & COMPANY
v.
COMMERCIAL UNION INSURANCE CO.
No. 56753.
Supreme Court of Mississippi.
August 26, 1987.
Rehearing Denied November 18, 1987.
Jack W. Brand, Kenneth Harmon, Gerald, Brand, Watters, Cox & Hemleben, Jackson, for appellant.
Kenneth G. Perry, Ken R. Adcock, Shell, Buford, Bufkin, Callicutt & Perry, Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and SULLIVAN and GRIFFIN, JJ.
GRIFFIN, Justice, for the Court:
This case, concerning an independent auditor's liability to a third party, comes to the Court from the Circuit Court of the First Judicial District of Hinds County, where a jury found Touche Ross & Company negligent in its preparation of financial statements, upon which Commercial Union Insurance Company had relied when extending coverage to Fidelity Bank. The jury awarded Commercial Union $1,000,000 in actual damages and $500,000 in punitive damages. We reverse.
On September 28, 1979, the State Comptroller declared Fidelity Bank, a state chartered financial institution with offices in Jackson and Utica, insolvent, pursuant to Miss. Code Ann. § 81-9-5 (1972). Losses amounted to approximately $7,000,000. Thereafter, the Federal Deposit Insurance Corporation (FDIC) made claim against Commercial Union, which had issued Fidelity Bank a Bankers Blanket Bond, insuring against employee fraud. Upon investigation, Commercial Union agreed to settle the claim for $1,000,000, finding losses attributable to fraud by Fidelity Bank's president, *316 George S. Sanders, Jr., in excess of the policy's limits.
On May 6, 1983, Commercial Union filed suit against Touche Ross & Company, Fidelity Bank's independent auditor for 1977, alleging gross negligence in the preparation of financial statements, upon which Commercial Union had relied, when extending insurance coverage against employee fraud. Specifically, Commercial Union asserted that Touche Ross had failed to disclose adequately certain activities of which it was aware, in violation of Generally Accepted Accounting Principles (G.A.A.P.) and Generally Accepted Auditing Standards (G.A.A.S.). In fact, had Commercial Union known of these activities through the financial statements, Fidelity Bank's request for insurance coverage would have been denied. These activities include (1) the Mississippi Department of Bank Supervision's (MDBS) objections to the payment of a "highly irregular, if not illegal" dividend on March 20, 1977, (2) the Department's letter of June 1, 1977, requiring Fidelity Bank to secure the regulator's permission prior to the payment of future "cash dividends or the transfer of any funds ... to any affiliate or subsidiary corporation," and (3) Fidelity Bank's $200,000 loan to and $71,773 receivable from Affiliated Investments, Inc., Fidelity Bank's former parent, at a time when Touche Ross, through a separate financial statement on Affiliated Investments, questioned its ability to continue in operation.

The Dividend
On March 28, 1977, Fidelity Bank paid a dividend of $275,000 to Affiliated Investments, then Fidelity Bank's parent company, despite earnings of just $3,907 in 1976, and a loss of $16,897 in 1975. Prior to the payment, Sanders consulted with Michael Zito, Touche Ross' partner-in-charge, who told the bank's president that "at least" $275,000 was available for the dividend.
On May 18, 1977, the MDBS examined Fidelity Bank's records concerning the dividend. It concluded that the payment was "highly irregular, if not illegal". In particular, the regulator noted that the minutes of the board of directors were silent as to the dividend, minority stockholders had failed to receive any like distribution, the State Comptroller had not pre-approved its declaration, and the $275,000 had originated from the bank's surplus account, instead of the undivided profits account, thus implicating dedicated capital. Similarly, an FDIC examination of the same date concluded,
The violation with regard to payment of dividend deserves the special attention of all concerned. A number of regulations, recognized sound practices, and State law were violated with regard to this action. While there may be some question as to whether the funds were really surplus or undivided profits, the bank had used the total of these funds in determining its legal lending limits and bank reports and publications appear to lead one to consider them as true surplus as defined by bankers and bank regulators. In the latter case, the funds would not have been available for payment of dividends.
In response, the board of directors recorded the dividend's payment on the minutes, and individually executed waivers of their respective rights to the dividend as minority stockholders. Moreover, Touche Ross determined that the MDBS had not filed a regulation with the Secretary of State, requiring the pre-approval of cash dividends, though a common practice for state chartered banks.
At trial, Touche Ross also denied that G.A.A.P. or G.A.A.S. required the payment of a cash dividend only from the undivided profits account, when the bank's cumulative earnings, held in both the undivided profits and surplus accounts, were sufficient to make the $275,000 payment. Alone, the undivided profits account held $175,420.04.

The Letter
On June 1, 1977, the MDBS informed Sanders by letter that, due to conditions at Fidelity Bank, the payment of "cash dividends or the transfer of any funds ... to any affiliate or subsidiary corporation," required advance regulatory approval, pursuant to Miss. Code Ann. § 81-5-75 (1972), which reads in part:

*317 Should the state comptroller be of the opinion that the condition of any bank organized under the laws of this state is such that no dividends should be declared or paid on common stock of such bank, it shall be his duty to forthwith order and direct such bank to pay no dividend upon its common stock until further ordered by him. A bank upon which such notice has been served shall not thereafter declare or pay any dividend upon its common stock until the state comptroller shall withdraw or cancel the order prohibiting the same.
On December 30, 1977, Affiliated Investments divested itself of Fidelity Bank. Four days later, Fidelity Bank loaned Affiliated Investments $200,000. At the time of the loan, Sanders was the largest stockholder in Affiliated Investments, as well as an officer, director and largest stockholder in Fidelity Bank.
Although Touche Ross mentioned the loan on Fidelity Bank's financial statements, the auditors failed to question the loan's legality, or to note any restriction on the bank's capital in light of the letter from the MDBS. In fact, Touche Ross maintains that the letter was not in the bank's records during the audit. Therefore, it had no notice of the letter's content and, as a result, of the letter's effect on the loan or on the bank's capital. Interestingly, the letter does appear in the records of Fidelity Bank now held by the FDIC.
Touche Ross also avers that even had it discovered the letter, § 81-5-75, quoted above, does not provide the MDBS with the authority to bar transfers between a subsidiary and its parent. Likewise, the auditors contend that the letter was not a restriction on capital.

The Loan
During the period in which Touche Ross audited Fidelity Bank, it also audited Affiliated Investments. On March 20, 1978, Touche Ross issued a report to Affiliated Investments' board of directors, in which the auditors refused to express an opinion about the firm's financial statements, adding,
The financial statements have been prepared on the basis of the continuation of the Company as a going concern. However, the Company has incurred losses for the past four years, has a deficiency in assets at December 31, 1977, and, as discussed in Note A-1, the operations of the Company have been substantially reduced. The future of the Company as an operating business will depend upon its ability to operate profitably and the availability of such financing as may be required.
Ten days later, Touche Ross issued the report on Fidelity Bank, mentioned previously, which noted the $200,000 loan to Affiliated Investments.
Commercial Union asserts that the omission of information on Fidelity Bank's financial statements, concerning Affiliated Investments' doubtful viability, was in violation of G.A.A.P. and G.A.A.S. In short, Touche Ross should have noted Fidelity Bank's potential collection problems with the $200,000 loan and $71,773 receivable.
In response, Touche Ross maintains that there was no duty to disclose its views on Affiliated Investments' viability in Fidelity Bank's financial statements, after divestiture, especially where real estate, appraised at $272,000, secured the note and receivable. Parenthetically, Affiliated Investments ceased operations in the Summer of 1978.

Other Instances
Commercial Union also argues that Touche Ross was negligent in the treatment of the loan loss reserve at Fidelity Bank, finding it "grossly understated." In particular, Commercial Union contends that Fidelity Bank's reserve of $154,712 was, at a minimum, $108,032 deficient on December 31, 1977, the audit's examination date. Consequently, instead of $6,196 in profits for 1977, the financial statements should have shown $101,836 in losses. In addition, Commercial Union calculates total losses for loans, appearing in Fidelity Bank's loan portfolio on December 31, 1977, at $1,062,921.
Touche Ross, in turn, strongly disagrees with the alleged deficiency, finding the reserve *318 "more than adequate." Specifically, Touche Ross avers that Commercial Union failed to consider the loans' collateral as well as payments, which continue to be received, and wrongly included loans made after December 31, 1977. As a result, Touche Ross calculates total losses for loans appearing in Fidelity Bank's loan portfolio on December 31, 1977, at $101,237, well below the reserve.
Touche Ross also notes that the loan loss reserve exceeded the amount of loans classified as "losses" and "doubtful," in audits for 1974, 1975, 1976, and 1977. Yet, loans classified as "substandard" more than doubled in 1977, to approximately $1,300,000, and were not fully covered by the loan loss reserve.
Commercial Union is especially critical of the treatment accorded an unsecured $240,000 loan in December, 1977, to W.B. Holloway, who, with no prior credit history at Fidelity Bank, borrowed the sum on the basis of an application and an unaudited financial statement, listing his net worth at $1,790,800. On March 3, 1978, Anguilla Investment Company, owned by Holloway, borrowed $244,440, paying off Holloway's personal note. Although Holloway later signed the Anguilla Investment note as co-maker, Touche Ross was unaware of his personal liability at the time of the audit. Significantly, Anguilla Investment's total market value was only $50,000.
During the audit, Touche Ross questioned the legality of the initial loan, believing that Holloway had used the proceeds to purchase Affiliated Investment stock. Nevertheless, Touche Ross failed to reserve the loan in Fidelity Bank's financial statements, since it accepted Holloway's ability to make repayment, despite his use of the proceeds.
Commercial Union maintains that Touche Ross failed to make sufficient inquiry into the circumstances of the transaction, where Fidelity Bank had not only loaned money to purchase the stock of its then parent, Affiliated Investments, but also had accepted, initially, Anguilla Investment's note for $244,440, substantially higher than the borrower's total market value. Indeed, as a result of the investigation, Touche Ross disassociated itself from Affiliated Investments' proxy statement, since ownership of the stock was uncertain.
On October 31, 1978, Fidelity Bank loaned The Group, Inc., representing nine investors, $260,000, which paid off Anguilla Investment's note, receiving in return stock held by Holloway. In its Proof of Loss, submitted to Commercial Union, the FDIC found this loan "fraudulently and dishonestly made." Touche Ross responds that it relied upon an attorney's opinion which held that Fidelity Bank's initial loan to Holloway was legal. Subsequent loans, made after the audit, it deems irrelevant.
Finally, Commercial Union charges that Touche Ross lacked sufficient "independence" to conduct an audit of Fidelity Bank, noting its employment of Vincent Zito, Michael Zito's brother, as internal auditor during the first three months of 1977. Expert testimony was in conflict as to whether this compromised Touche Ross' ability to conduct an independent audit.

I.

Is an independent auditor liable to a third party, who, though lacking privity, relies to his detriment on financial statements

negligently prepared?
The seminal case on this issue is Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), where an independent auditor negligently certified financial statements upon which a lender subsequently relied. Chief Justice Cardozo, writing for the court, found no liability, lest "a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.[1] 255 N.Y. at 179, 174 N.E. at 444. But cf. MacPherson v. Buick *319 Motor Co., 217 N.Y. 382, 390, 111 N.E. 1050, 1053 (1916) (Cardozo, J.) ("If [a manufacturer] is negligent, where danger is to be foreseen, a liability will follow.")
Recently, in Credit Alliance Corp. v. Arthur Anderson & Co., 65 N.Y.2d 536, 553, 493 N.Y.S.2d 435, 444, 483 N.E.2d 110, 118 (1985), the New York Court of Appeals, again faced with an auditor's liability to a third party lender, reaffirmed the Ultramares doctrine, finding that the facts failed "to demonstrate the existence of a relationship between the parties sufficiently approaching privity." Expanding on the theme, the Court noted:
Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance. While these criteria permit some flexibility in the application of the doctrine of privity to accountants' liability, they do not represent a departure from the principles articulated in Ultramares,

.....
See also, White v. Guarente, 43 N.Y.2d 356, 361-362, 401 N.Y.S.2d 474, 477-8, 372 N.E.2d 315, 318-19 (1977), Glanzer v. Shepard, 233 N.Y. 236, 238-9, 135 N.E. 275 (1922).
Similarly confronted with an auditor's negligence, other jurisdictions have applied the Ultramares doctrine as well: Stephens Industries, Inc. v. Haskins & Sells, 438 F.2d 357, 359 (10th Cir.1971) (applying Colorado law); McLean v. Alexander, 599 F.2d 1190, 1202 (3rd Cir.1979) (applying Delaware law); Investment Corp. of Florida v. Buchman, 208 So.2d 291, 293 (Fla. Dist. Ct. App. 1968); Toro Co. v. Krouse, Kern & Co., Inc., 644 F. Supp. 986, 994 (N.D.Ind. 1986) (applying Indiana law).
Restatement (Second) of Torts § 552 (1977), expresses an alternate view:
(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
The Restatement then allows recovery by third parties, whom the auditor intends to supply with information, or knows that his client intends to supply with information. Yet, the particular identity of the third party is not relevant. See, Restatement (Second) of Torts § 552 comment h (1977). This is unlike the view, expressed in Ultramares, which requires the auditor to know, specifically, the third party, who acts in reliance.
Several jurisdictions have adopted or favorably cited the Restatement view, recognizing an auditor's liability to a foreseen third party: Badische Corp. v. Caylor, 257 Ga. 131, 356 S.E.2d 198, 199-200 (1987); Matter of Hawaii Corp., 567 F. Supp. 609, 617 (D.Haw. 1983) (applying Hawaii law); *320 Ryan v. Kanne, 170 N.W.2d 395, 402-03 (Iowa 1969); Ingram Industries, Inc. v. Nowicki, 527 F. Supp. 683, 684 (E.D.Ky. 1981) (applying Kentucky law); Bonhiver v. Graff, 311 Minn. 111, 122-23, 248 N.W.2d 291, 298-9 (1976); Spherex Inc. v. Alexander Grant & Co., 122 N.H. 898, 451 A.2d 1308, 1312 (1982); Haddon View Investment Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 157, 436 N.E.2d 212, 214-15 (1982); Eisenburg v. Gagnon, 766 F.2d 770, 778 (3rd Cir.1985) (applying Pennsylvania law); Rusch Factors, Inc. v. Levin, 284 F. Supp. 85, 92-93 (D.R.I. 1968) (applying Rhode Island law); Shatterproof Glass Corp. v. James, 466 S.W.2d 873, 879 (Tex. Civ.App. 1971); Milliner v. Elmer Fox & Co., 529 P.2d 806, 808 (Utah 1974).[2]See also, Brumley v. Touche, Ross & Co., 123 Ill. App.3d 636, 641-42, 79 Ill.Dec. 57, 463 N.E.2d 195, 199-200 (1984)
A third view stems from Biakanja v. Irving, 49 Cal.2d 647, 650, 320 P.2d 16, 19 (1958), where the California Supreme Court stated:
The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.
Although the case involved a notary public, two states, citing Biakanja, have applied its balancing test, where a third party has relied upon financial statements, negligently prepared. Aluma Kraft Manufacturing Co. v. Elmer Fox & Co., 493 S.W.2d 378, 383-4 (Mo. Ct. App. 1973) ("Our rejection of the requirement of the strict rule of privity in this case comports with the concepts of the functions and duties of the modern public accountant [and] the purposes of a modern audit ..."); Raritan River Steel Co. v. Cherry, Bekaert & Holland, 79 N.C. App. 81, 339 S.E.2d 62, 69 (1986) ("The Biakanja test ... avoids the necessity of an arbitrary, purpose-based determination of liability by allowing a court to weigh the purpose of the audit as one of several determinative factors.")[3]
In H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 352, 461 A.2d 138, 153 (1983), where the plaintiffs relied on negligently prepared financial statements, when accepting stock as payment for their business' sale, the New Jersey Supreme Court broke completely with the Ultramares doctrine, stating:
When the independent auditor furnishes an opinion with no limitation in the certificate as to whom the company may disseminate the financial statements, he has a duty to all those whom that auditor should reasonably foresee as recipients from the company of the statements for its proper business purposes, provided that the recipients rely on the statements pursuant to those business purposes. The principle that we have adopted applies by its terms only to those foreseeable users who receive the audited statements from the business entity for a proper business purpose to influence a business decision of the user, the audit having been made for that business entity.
Three weeks later, the Wisconsin Supreme Court, citing H. Rosenblum, also found an accounting firm liable for "all foreseeable consequences of [its] acts," excepting the application of certain public policy considerations. Citizens State Bank v. Timm, Schmidt & Co., 113 Wis.2d 376, 386, 335 N.W.2d 361, 366 (1983). The considerations against the imposition of liability include,
(1) The injury is too remote from the negligence; or (2) the injury is too wholly *321 out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.
113 Wis.2d at 387, 335 N.W.2d at 366.
Yet, in Continental Assurance Co. v. American Bankshares Corp., 601 F. Supp. 277, 281 (E.D.Wis. 1985), the United States District Court questioned "whether the rule in Wisconsin had really been changed at all." In short, the Court found that the exceptions, listed above, essentially swallowed the rule.
Elsewhere, in International Mortgage Co. v. John P. Butler Accountancy Corp., 177 Cal. App.3d 806, 820, 223 Cal. Rptr. 218, 227 (1986), where a real estate developer relied upon negligently prepared financial statements when purchasing government loans, a California appellate court, also citing H. Rosenblum, adopted the reasonably foreseeable third party approach.
The four views, expressed above, variously require a known third party (Credit Alliance), a foreseen third party (Restatement), and a reasonably foreseeable third party (Biakanja, H. Rosenblum). The jury instructions are consistent with H. Rosenblum, allowing recovery against Touche Ross, should it have "reasonably foreseen" Commercial Union's reliance, while Touche Ross urges the adoption of the standard in Credit Alliance or the Restatement.
Clearly, H. Rosenblum represents the only theory under which Touche Ross can be held liable, since Touche Ross neither knew of Commercial Union's reliance (Credit Alliance), nor intended to supply Fidelity Bank with information for Commercial Union's benefit and guidance (Restatement). Indeed, United States Fidelity & Guaranty Company (USF & G), Fidelity Bank's previous carrier, first gave notice of cancellation on August 2, 1978, four months after the audit's completion. USF & G, a giant in the insurance and bonding business, which enjoys a good reputation for business acumen, upon seeing the audit report, had run, while the appellee here hastily grabbed a premium and came in.
At most, Commercial Union's reliance was "reasonably foreseeable" at the time of the audit, since Touche Ross, having read the bankers blanket bond's terms, was aware that USF & G could cancel its coverage with thirty days' notice. Therefore, only if the Court adopts the reasonably foreseeable standard, can it affirm.
Obviously, the Court cannot adopt the known third party approach. Miss. Code Ann. § 11-7-20 (Supp. 1986) reads, "In all causes of action for personal injury or property damage or economic loss brought on account of negligence, strict liability or breach of warranty, including actions brought under the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain said action." See also, Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 673 (Miss. 1983) ("A plain reading of the statute clearly suggests that it was the legislative intent to remove the privity requirement in all cases"). Credit Alliance, reaffirming Ultramares, requires just such privity, and is consequently forbidden under our law.
The Restatement, in turn, offers a middle ground, allowing foreseen third parties to recover from a negligent auditor. Yet, the Restatement "is similar to the privity rule in that it draws an arbitrary limit on the class of potential plaintiffs." Note, Negligent Misrepresentation and the Certified Public Accountant: An Overview of Common Law, 18 Suffolk U.L.Review, 431, 445-46 (1984). In fact, there is no reason to prefer a foreseen user over a foreseeable user since "neither party pays for the audit, and neither party is owed a greater duty of care from the accountant." Comment, The Enlarging Scope of Auditors' Liability to Relying Third Parties, 59 Notre Dame L.Rev. 281, 287 (1983). Consequently, under the Restatement, the audit's purpose solely defines the auditor's liability *322 to third parties. See, Besser, Privity?  An Obsolete Approach to the Liability of Accountants to Third Parties, 7 Seton Hall 507, 527 (1976). But cf., Palsgraf v. Long Island R. Co., 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928) (Cardozo, C.J.) ("The risk reasonably to be perceived defines the duty to be obeyed... .")
Nevertheless, investors, creditors, vendors, and insurers regularly rely on audits conducted by independent examiners for a variety of purposes. Though reasonably foreseeable users of the audit, they are too often excluded from any recovery, despite losses, because of the negligent auditor's limited immunity from a third party's suit.
In H. Rosenblum, 93 N.J. at 351, 461 A.2d at 152, the New Jersey Supreme Court sought to shift this loss from the innocent third party, who had detrimentally relied, to the negligent auditor, stating,
In the final analysis the injured party should recover damages due to an independent auditor's negligence from that auditor. This would shift the loss from the innocent creditor or investor to the one responsible for the loss. Accountants will also be encouraged to exercise greater care leading to greater diligence in conducting audits.
Similarly, in International Mortgage, 177 Cal. App.3d at 820, 223 Cal. Rptr. at 227, the California court voiced a similar note, also emphasizing the dispersion of risk through insurance:
An innocent plaintiff who foreseeably relies on an independent auditor's unqualified financial statement should not be made to bear the burden of the professional's malpractice. The risk of such loss is more appropriately placed on the accounting profession which is better able to pass such risk to its customers and the ultimate consuming public. By doing so, society is better served; for such a rule provides a financial disincentive for negligent conduct and will heighten the professions' cautionary techniques.
See also, Mess, Accountants and the Common Law: Liability to Third Parties, 52 Notre Dame Lawyer 838, 856 (1977); Note, Accountants' Liability for Negligence  A Contemporary Approach for a Modern Profession, 48 Fordham L.Rev. 401, 414-15 (1979).
H. Rosenblum does not, though, establish the independent auditor as the financial statement's guarantor. Rather, it merely recognizes that an accountant must perform the audit in a professionally reasonable manner, allowing reasonably foreseeable users to rely without the risk of loss associated with the auditor's negligence.[4] This is consistent with Wiener, 20 San Diego L.Rev. at 258, where it reads:
It must be remembered that one of the specific functions for which the accountant is employed is the detection of corporate fraud. Accountants and accounting firms derive substantial economic benefit because of their abilities in this regard. It hardly seems oppressive that they perform this task in a professionally reasonable manner.
Based on the discussion above, the Court finds that an independent auditor is liable to reasonably foreseeable users of the audit, who request and receive a financial statement from the audited entity for a proper business purpose, and who then detrimentally rely on the financial statement, suffering a loss, proximately caused by the auditor's negligence. Such a rule protects third parties, who request, receive and rely on a financial statement, while it also protects the auditor from an unlimited number of potential users, who may otherwise read *323 the financial statement, once published. Of course, the auditor remains free to limit the dissemination of his opinion through a separate agreement with the audited entity. We believe the rule announced here is fair to all concerned and gives ample protection not only to national firms, based in Jackson, such as the appellant, but also to solo practitioners in the smaller communities of this state, while simultaneously demanding of them high professional standards.
Here, the jury heard uncontradicted evidence that the insurer requested and received financial statements from Fidelity Bank, which had sought coverage against employee fraud. Instruction D-6, noted above, allowed recovery against Touche Ross, should it have "reasonably foreseen that an entity such as Commercial Union Insurance Company" might rely on the audit. Under these facts, the jury instruction was entirely consistent with our holding in this appeal.

II.

Is an independent auditor liable to a third party, when losses occur through criminal conduct, wholly subsequent to performance

of the audit?
The FDIC attributed Fidelity Bank's failure to Sanders' "fraudulent and dishonest activities," which, according to the regulator's claim against Commercial Union, commenced on July 27, 1978, four months after Touche Ross had completed its audit. Touche Ross then appeals the trial judge's refusal to grant certain jury instructions, namely, D-1, a peremptory instruction, and D-4, D-14, D-15 and D-17, each of which addressed Sanders' criminal conduct as an intervening cause of the loss sustained by Commercial Union.
In Mississippi, actionable fault must be predicated upon action or inaction, prompted by knowledge, actual or implied, of facts which make the result of the defendant's conduct not only the probable result but also a result which the defendant should, in view of the facts, have reason to anticipate. Sprayberry v. Blount, 336 So.2d 1289, 1294 (Miss. 1976). See also, Cadillac Corp. v. Moore, 320 So.2d 361, 365 (Miss. 1975); William v. Lumpkin, 169 Miss. 146, 152-53, 152 So. 842, 844 (1934). Moreover, the defendant's conduct must then cause the loss, by natural and continuous sequence, unbroken by any efficient intervening causes. Thompson v. Mississippi Central Railroad Co., 175 Miss. 547, 554-55, 166 So. 353 (1936). See also, Planters Wholesale Grocery v. Kincade, 210 Miss. 712, 720, 50 So.2d 578, 583 (1951), Crosby v. Burge, 190 Miss. 739, 749, 1 So.2d 504, 507 (1941).
In Mississippi City Lines v. Bullock, 194 Miss. 630, 639, 13 So.2d 34, 36 (1943), the Court stated,
Although one may be negligent, yet if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a non-actionable cause. Negligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof. The question is, did the facts constitute a succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the alleged wrong and the injury?
See also, Saucier v. Walker, 203 So.2d 299, 305 (Miss. 1967); Hoke v. W.L. Holcomb & Associates, Inc., 186 So.2d 474, 477 (Miss. 1966).
Significantly, although the defendant's original negligence is actionable, "if the occurrence of the intervening cause might reasonably have been anticipated," McCorkle v. United Gas Pipeline Co., 253 Miss. 169, 188, 175 So.2d 480, 489 (1965), the defendant is not required to anticipate an "unusual or improbable result," Paramount-Richards Theatres v. Price, 211 Miss. 879, 887, 53 So.2d 21, 22 (1951), or other "remote possibilities," Wright v. Illinois *324 Central Railroad Co., 196 Miss. 150, 155, 16 So.2d 381, 383 (1944). Absent special circumstances, criminal conduct is one such remote possibility.
Restatement (Second) of Torts § 448 (1977) reads,
The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.
Similarly, 57 Am.Jur.2d Negligence § 206 (1971) states,
Where the courts consider the question of proximate cause as determinative of liability ..., the general rule is that when, between an original negligent act or omission and the occurrence of an injury, there intervenes a wilful, malicious, and criminal act of a third person which causes the injury but was not intended by the person who was negligent, and could not have been foreseen by him, the causal chain between the negligence and the accident is broken. The deliberate, intentional, wrongful, or criminal acts of independent third persons, not actually intended by the defendant, are not regarded by the law as natural consequences of his wrong, and he is not bound to anticipate the general probability of such acts.
In Robinson v. Howard Brothers of Jackson, Miss., 372 So.2d 1074, 1076 (Miss. 1979), where a store's employee negligently sold a gun to Alexander, a minor, who subsequently shot Robinson, prompting Robinson's husband to sue the store for wrongful death, this Court upheld a directed verdict for the store, stating,
In sum, the intentional criminal act of Alexander was an independent intervening cause that broke the causal connection between defendants' negligent act and the death of Mrs. Robinson. The criminal act cannot be said to have been within the realm of reasonable foreseeability because the defendants, although negligent per se, could reasonably assume that Alexander would obey the criminal law. We hold that plaintiffs failed to prove a cause of action upon which relief could be granted and the court correctly directed the verdict for defendants. (emphasis added).
Yet, in Howard Brothers of Phenix City, Inc. v. Penley, 492 So.2d 965, 968 (Miss. 1986), the Court distinguished Robinson, supra, finding a store liable to a customer, shot by another customer, who had grabbed a gun and ammunition when a sales clerk turned to reach for a purchase form. Specifically, the Court found that the shooting was not an intervening cause, since the clerk had failed to determine the customer's mental state prior to her display of the gun and ammunition, and to safeguard both when reaching for the purchase form. In conclusion, the Court stated, "We find that some injury should clearly have been foreseeable by this lax conduct in the sale of handguns." Id.
In the present case, there are no guns, toted by madmen  merely financial statements, prepared by accountants. To hold Touche Ross liable for losses, stemming from criminal conduct which began four months after completion of the audit, based solely upon the accounting firm's alleged negligence during the time of its preparation, is too remote for the imposition of liability. Indeed, no dividend, letter or loan should have suggested Sanders' subsequent fraud, where Touche Ross "could reasonably assume that [its customer] would obey the criminal law." Robinson, 372 So.2d at 1076.
Therefore, it was error for the trial judge to deny the peremptory instruction, since Touche Ross was entitled to judgment as a matter of law. Burnham v. Joseph, 482 So.2d 1151, 1153 (Miss. 1986), Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss. 1985), Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). Likewise, it was error to deny instructions on Sanders' *325 criminal conduct acting as an intervening cause of Commercial Union's loss.
Consistent with the above, we reverse.
REVERSED AND RENDERED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] "The spectre of unlimited liability, with claims devastating in number and amount crushing the defendant because of a momentary lapse from proper care, has haunted the courts." W. Prosser, The Law of Torts § 107 (4th ed. 1971).
[2] Cases citing Restatement (Second) of Torts, § 552, while in draft form, are included.
[3] An analysis of the factors, listed in Biakanja, appears in Wiener, Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation, 20 San Diego L.Rev. 233, 255-6 (1983).
[4] In United States v. Arthur Young & Co., 465 U.S. 805, 817-18, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826, 836 (1984), Chief Justice Burger of the United States Supreme Court stated, "By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This `public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust." (emphasis in original)