# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01713-SCT

*DOUBLE QUICK, INC.*

*v.*

*RONNIE LEE LYMAS*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/24/2008 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN C. HENEGAN |
| | ROBERT M. FREY |
| | LEANN W. NEALEY |
| | WILLIE T. ABSTON |
| | JOHN D. BRADY |
| ATTORNEYS FOR APPELLEE: | JOE N. TATUM |
| | LATRICE WESTBROOKS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED; ON CROSS APPEAL: DISMISSED - 09/23/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     In this premises liability case, following a full week of trial, the jury returned a verdict in excess of $4,000,000 in favor of the plaintiff, Ronnie Lee Lymas, for compensatory damages. The defendant, Double Quick, successfully moved to reduce the verdict based on the $1,000,000 statutory cap on noneconomic damages. Miss. Code Ann. § 11-1-60(b) (Rev. 2002). Double Quick appealed the verdict, arguing that the plaintiff failed to prove liability, and Lymas cross-appealed, arguing that the statutory cap on noneconomic damages is

unconstitutional. Finding that Lymas failed to prove causation, we reverse and render judgment in favor of Double Quick and dismiss Lymas's cross-appeal as moot.

### Facts

¶2. Very few facts in this case are undisputed, but the parties agree that on Friday, January 26, 2007, around 5:00 p.m., Ronnie Lymas was shot several times by Orlando "Redboy" Newell on the Double Quick convenience store's parking lot in Belzoni, Mississippi. Lymas survived the shooting, but sustained serious permanent injuries, which left him unable to work.

¶3. Lymas testified that on the afternoon of January 26, 2007, he and a friend, Donald Lucas, walked together to the Double Quick convenience store, which is located at the intersection of two main municipal thoroughfares. Lymas said that, as he and Lucas were approaching the store, he recognized a man named Allen Unger, who was engaged in a verbal altercation with another man near the pay phone in the Double Quick parking lot. Lymas testified that, roughly two years prior, Unger had shot a man named Willie Earl Moore. Moore was distantly related to Lymas, but Lymas testified that he and Moore were not close to each other. Lymas said that he did not recognize the man with whom Unger was arguing but learned later that this man's name was Orlando "Redboy" Newell.

¶4. Lymas said that he went into the Double Quick, purchased a soft drink, then followed his friend Lucas out of the store. When they exited, Unger and Newell were still arguing. Lymas said that when he saw Newell "reach for something," Lymas turned around and walked the other way in an attempt to avoid any crossfire. Lymas said that, as he was

walking away, he was shot in the back. Lymas testified that, even after he had fallen to the ground, Newell kept shooting. According to Lymas, Newell kicked and spat on Lymas before running away, and as Lymas lay on the ground, wounded, four or five people surrounded him and started kicking and stomping him. A short time later, an ambulance arrived and transported Lymas to the Humphreys County Hospital.

¶5. Lymas did not present other eyewitnesses to the shooting, but five Double Quick employees who had been present at the store that day did testify at trial. Although many of the employees knew Unger, Newell, and Lymas, only one employee, Shavon Ellis, remembered seeing any of the men at the store before Lymas was shot. Ellis was finishing her shift around 5:00 p.m., and like Lymas, she also witnessed an argument in the parking lot. However, according to Ellis, it was Lymas who was arguing with Unger, not Newell. Ellis testified that she did not notify her supervisors about the argument because she thought it was "a normal, everyday argument," and she "didn't think it escalated." Ellis heard the gunshots as she was driving away.

¶6. Other than Lymas, the only other witness to the shooting who testified at trial was Unger, who was called as a witness for Double Quick. Unger claimed that he was inside the store on the day in question when he saw Lymas outside drinking a beer. According to Unger, he believed that Willie Earl Moore had hired someone to kill him, so he confronted Lymas about the "hit" because he knew Moore and Lymas were friends. Unger said that he knocked the beer out of Lymas's hand, and when he did, Lymas pulled out a gun. Unger said that he ran and then heard gunshots, thinking that Lymas was shooting.

3

¶7.    Double Quick also entered into evidence without objection a statement from Orlando Newell taken a few days after the shooting. Newell's statement substantially corroborated Unger's version of events that Lymas was the aggressor. According to Newell, Lymas displayed a gun and told Newell and Unger that he was going to kill both of them. Newell stated that Unger ran away, but, scared for his life, Newell shot Lymas in self-defense.

¶8.    Lymas attempted to establish that Newell and Unger had violent tendencies by adducing evidence that both Newell and Unger had been indicted for aggravated assaults with firearms. Unger pled guilty to shooting Willie Earl Moore and was incarcerated, but the record does not reveal how much time he served. It is also unclear from the record whether Newell was ever convicted, but the case file from the Belzoni Police Department regarding the charge against Newell was admitted into evidence over objection from Double Quick.

¶9.    Lymas also attempted to establish that Double Quick had knowledge of Newell and Unger's alleged violent tendencies. Double Quick employee Shanetta Thurman testified that she had a part-time job at the Humphreys County courthouse, and it was at this second job that she learned both Unger and Newell were facing criminal charges for aggravated assaults with firearms. All but one other employee denied knowledge of these charges, but Truron Grayson, an officer with the Belzoni Police Department, testified that it was well known in the community that Newell had shot another man.

¶10.    The plaintiff also called to the stand two Double Quick employees who were not present on the day of the shooting. Scott Shafer, the vice-president of operations and

4

marketing at the Double Quick headquarters in Indianola, Mississippi, testified about the general training of employees. According to Shafer, the employees were not required to take action to remove persons with violent histories from the premises unless such persons were causing a disturbance. If an altercation did occur, the employees were to call the authorities.

¶11. Dale Taylor, the area manager for Double Quick, testified that employees were trained at "Double Quick University" where they were instructed on armed robbery prevention. He testified that managers are taught to ask unruly customers to leave the store and then call the police. According to Taylor, if Unger and Newell were not causing a disturbance, the employees would have had no reason to remove them from the premises.

¶12. Lymas also attempted to establish liability by claiming that an atmosphere of violence existed in and around the store, but that Double Quick did not take reasonable steps to protect its customers. The testimony regarding the safety of the area was conflicting. One of the Double Quick employees responded affirmatively when asked whether people were "arguing and fighting at the Double Quick everyday." Another said that she had worked at the Double Quick for eight months and had witnessed only a single verbal altercation on the premises.

¶13. Sheila Taylor, a waitress at the Varsity restaurant located directly across the street from the Double Quick, testified that she saw a lot of "open containers" in the Double Quick parking lot, and she suspected the occurrence of illegal drug activity. She said that she had seen "five or six" fistfights, but never had reported these fights to the police. Taylor said there was a lot of "arguing, fighting going on. I see cops over there throughout the night,

5

sometimes the day, off and on." Taylor denied feeling unsafe in the area, but said she had stopped walking to work alone after someone had made an obscene gesture in her direction.

¶14.   Dorothy Elder, the records custodian at the Belzoni Police Department, testified regarding the department's "incident lists" and "incident reports." The incident lists essentially were call logs, and a dispatcher assigned a numerical code to every call to the police department reporting suspected criminal activity. These codes indicated the type of crime the call was reporting, but the codes were not necessarily indicative of what actually had occurred. Elder testified that the time and date on the incident list was the time of the call and not the time that the reported activity had occurred. She also testified that the locations noted on the incident lists were the addresses from which the calls were made, not the locations of the reported activities. Once an officer was dispatched, that officer would decide whether an investigation should ensue and whether an incident report would be made. These incident reports consisted of brief synopses of the alleged criminal activities

¶15.   Over the objection of Double Quick, Lymas introduced into evidence the department's incident lists from September 27, 2006, through January 26, 2007, the day of the shooting. The trial court overruled Double Quick's objection and admitted these documents. The plaintiff also introduced, and the trial court received into evidence, an incident list containing only calls that originated from the Double Quick. That list included calls from as far back as January 29, 2002, five years before Lymas was shot. Finally, the plaintiff introduced, and the court admitted, three incident reports involving alleged crimes committed on the Double Quick property.

6

¶16.    The first incident report, dated May 2, 2004, was titled "fighting/resisting arrest," and described an altercation between one individual with a small knife and another with a stick. The reporting officer wrote that he witnessed one man chasing another while the officer was parked at the Double Quick, but Elder acknowledged that nothing in the report indicated that any crime occurred on Double Quick property. The report also indicated that a security guard was present at the Double Quick when that incident occurred.

¶17.    The second incident report was dated December 11, 2004, and was titled "armed robbery." The report stated that at 2:35 a.m., a suspect attempted to rob someone who was sitting in a car on the Double Quick parking lot. At the time, three law enforcement officers were directly across the street at the Varsity restaurant.

¶18.    The third incident report was dated September 27, 2006, and titled "robbery." However, on the incident list, the entry code is for an "armed robbery." Elder testified that nothing in the report indicated that the code for "armed robbery" was valid.

¶19.    Lymas's experts relied on these incident lists and incident reports to opine that an atmosphere of violence existed at the Double Quick store. Dr. Michael Clay Smith was the first expert to testify in Lymas's case-in-chief. He testified that he had performed a study on the reliability of incident lists, such as the call logs in the instant case, and had found them to be ninety-six percent reliable. Dr. Smith looked at the incident list specific to Double Quick's address and noted that in the five years prior to the shooting, the police had responded to "14 fights, 33 thefts, 2 motor vehicle thefts, 39 either complaint or trouble calls . . . and one public drunk." Dr. Smith testified that reporting levels were low for convenience

7

stores in high-crime areas and that "probably 20 to 30 percent are reported." He also looked at the incident list for the entire city and opined that, within a one-mile radius of the Double Quick, there had been "17 fights, five armed robberies, five drug cases, and one rape or attempted rape," in the four months leading up to the shooting.

¶20. Dr. Smith ultimately concluded that the attack on the plaintiff was foreseeable and that Double Quick did not provide "reasonably adequate security" to guard against such an attack. He noted that the employees received no training on what to do "if a person known to be violent came onto the property." He testified that because two employees knew Unger and Newell had been involved in aggravated assaults, Double Quick should have banned them from the premises. Dr. Smith also testified that Double Quick should have had cameras on the parking lot because "fully half of the retail store crime – serious crime problems happen in a parking lot." Dr. Smith opined that the employees should have been trained to be observant of the parking lot and aware of any loiterers. He also found that Double Quick should have conducted a security study or reviewed crime statistics from the police department. However, regarding that particular store, Dr. Smith testified that "the most effective crime deterrent would be the presence of a very obvious security guard."

¶21. As for causation, Dr. Smith merely answered in the affirmative when asked "whether the breaches you've just described . . . whether they proximately caused the shooting of Ronnie Lymas."

¶22. Commander Tyrone Lewis of the Jackson Police Department also testified as a plaintiff's security expert in the case. Like Dr. Smith, he testified that, based on the crime

statistics, an atmosphere of violence existed, although, unlike Dr. Smith, Lewis spoke only in general terms. When probed on cross-examination about the validity of the incident lists, and in particularly the "armed robbery" report from September 27, 2006, Lewis testified, "[i]n my opinion, one crime is too many. That robbery led to the violent attack and shooting of Mr. Lymas."

¶23. Lewis also agreed with Dr. Smith that Double Quick breached its duty to provide reasonably safe premises by not properly training its employees, not having cameras on the parking lot, not hiring a security guard, not reviewing the crime statistics, and not banishing Unger and Newell from the property.

¶24. Warren Woodfork was called to testify as an expert for the defense. Woodfork testified that the shooting was not foreseeable because Double Quick had neither actual nor constructive knowledge that Newell had a violent nature. As for the atmosphere of violence, Woodfork found that, based on the testimony of Captain Elder, the police department was misusing the computer-aided dispatch system such that the incident reports were unreliable. Woodfork testified that the incident lists were unreliable because they did not reflect what crimes, if any, actually had occurred.

¶25. Woodfork also opined that Double Quick had taken adequate safety measures because the store was well kept and clean, and there were security cameras on the inside. He testified that an outdoor camera would not have deterred Newell, because he obviously shot Lymas in front of witnesses. Likewise, he testified that the National Association of Convenience Stores did not recommend armed security guards, because they could create more of a

9

problem in causing innocent bystanders to be shot. As for training, Woodfork opined that it was prudent to tell employees not to confront a person who was known to be violent. Specifically, he "wouldn't advise ladies who work in a store to confront somebody like Orlando Newell."

¶26.    By a vote of 9-3, the jury returned a general verdict in favor of Lymas and awarded compensatory damages in the amount of $4,173,350.49. No punitive damages were awarded in this case. Double Quick filed a motion to amend the judgment to reduce the noneconomic portion of the compensatory damages award to the statutory cap of $1,000,000. Miss. Code Ann. § 11-1-60(2)(b) (Rev. 2002). The trial court granted Double Quick's motion and reduced the final award to $1,679,717, finding that the plaintiff's economic damages were $679,717.

¶27.    Lymas responded with a motion to declare the statutory cap on noneconomic damages unconstitutional. Double Quick then filed a motion for a judgment notwithstanding the verdict or, alternatively, a motion for a new trial. The Office of the Attorney General was granted leave to intervene as a nonaligned party on behalf of the State of Mississippi to defend the constitutionality of Section 11-1-60(b)(2). The trial court held a hearing and summarily denied both parties' motions. Double Quick appealed and Lymas cross-appealed.

## Issues

¶28.    The appellant, Double Quick, argues on appeal that: (1) Lymas failed to prove that any alleged negligence on behalf of Double Quick was the proximate cause of his injuries; (2) the trial court erred in failing to exclude the plaintiff's expert testimony as purely

10

speculative; (3) Lymas failed to prove that the injury was foreseeable because he failed to establish (a) that Newell had a "violent nature" or (b) that the store was located in an atmosphere of violence; and (4) the jury was improperly instructed. We find the first two issues are interrelated and are dispositive.

## Standard of Review

¶29. Double Quick's arguments attack the sufficiency of the evidence; averring that the trial judge should have granted its motion for a judgment notwithstanding the verdict (JNOV). *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 22 (Miss. 2007) (citing *White v. Yellow Freight Sys., Inc.,* 905 So. 2d 506, 510 (Miss. 2004)). This Court applies a *de novo* review to the denial of a motion for JNOV, considering all of the evidence in the light most favorable to the verdict. *United States Fid. and Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 964 (Miss. 2008) (citations omitted). We will affirm the denial where there is "substantial evidence to support the verdict," but we will reverse if "the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Id.* (quoting *White v. Stewman,* 932 So. 2d 27, 32 (Miss. 2006)).

## Discussion

¶30. To prevail, Lymas must demonstrate: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) damages; and (4) a causal connection between the breach and the damages, such that the breach is the proximate cause of the damages." *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So. 2d 413, 416 (Miss. 1988)

11

(citations omitted). "Although not an insurer of an invitee's safety, a premises owner owes a duty to exercise reasonable care to protect the invitee from reasonably foreseeable injuries at the hands of another." *Simpson v. Boyd*, 880 So. 2d 1047, 1051 (Miss. 2004) (citing *Newell v. S. Jitney Jungle Co.*, 830 So. 2d 621, 623 (Miss. 2002)). Generally, "criminal acts can be intervening causes which break the causal connection with the defendant's negligent act, if the criminal act is not within the realm of reasonable foreseeability." *O'Cain v. Harvey Freeman & Sons, Inc.*, 603 So. 2d 824, 830 (Miss. 1991) (citing *Touche Ross v. Commercial Union Ins.*, 514 So. 2d 315, 324 (Miss. 1987); *Robinson v. Howard Bros. of Jackson, Miss.*, 372 So. 2d 1074, 1076 (Miss. 1979)). In premises liability cases, foreseeability may be established by proving that the defendant had "(1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists on the premises." *Corley v. Evans*, 835 So. 2d 30, 38-39 (Miss. 2003) (quoting *Lyle v. Mladinich*, 584 So. 2d 397, 399 (Miss. 1991)).

¶31. According to Jury Instruction Number 8, tendered by Lymas and granted by the trial court, Double Quick could have breached its duty to provide a reasonably safe environment:

1. By failing to have a visible security guard on duty patrolling the parking lot of the premises at the time of the assault upon Lymas; or

2. By failing to train its employees to identify and take action to remove violent persons, if any, from the Double Quick store premises; or

3. By relying unreasonably on employees calling the Belzoni Police department after an altercation had already begun; or

4. By failing to monitor the parking lot areas with a security camera; or

5. By failing to conduct a security risk study or survey to assess the true level of crime occurring on and around the subject premises; or

6. By failing to meet the industry standard as set forth by the National Association of Convenience Stores, that require employees to be aware and observant of persons on the premises (both inside and outside the store) and in proximity to the store.

¶32. Double Quick argues that, even if these allegations constituted a breach of the standard of care, Lymas did not prove that any such breach proximately caused the shooting. Indeed, the only evidence tending to establish proximate cause was the testimony of the plaintiff's two expert witnesses. Double Quick argues that neither Smith's nor Lewis's testimony was admissible because it was not "based upon sufficient facts or data" and was not "the product of reliable principles and methods" as required by the Mississippi Rule of Evidence 702.[1]

¶33. Yet, as with all evidence, expert testimony must be relevant. M.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. "The threshold for admissibility is not great, keeping in mind the fact that Rule 401 favors the admission of evidence when it has probative value." *Utz v.*

---

[1]    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

M.R.E. 702.

13

***Running & Rolling Trucking, Inc.***, 32 So. 3d 450, 457 (Miss. 2010) (citing ***Investor Res. Servs., Inc. v. Cato***, 15 So. 3d 412, 417 (Miss. 2009)).  Furthermore, the expert must demonstrate that his opinion "is based upon scientific methods and procedures, not unsupported speculation." ***Id.*** (citing ***Adcock v. Miss. Transp. Comm'n***, 981 So. 2d 942, 947 (Miss. 2008)).

¶34.    Although Lymas's expert witnesses testified at length about the various steps Double Quick should have taken to prevent the injury, neither expert testified with any particularity that Double Quick's failure to take these steps was the proximate cause of Lymas's injuries. Dr. Smith simply answered in the affirmative when asked, in a leading question, whether Double Quick's omissions caused the shooting.  Commander Lewis did the same, but he also offered the illogical opinion that the September 27, 2006, robbery had "led to the violent attack and shooting of Mr. Lymas."

¶35.    The speculative testimony of the expert witnesses called by the plaintiff was insufficient as a matter of law to establish proximate cause.  The general nature of these experts' testimony resulted in the jury's having been left to speculate and guess about causation.  While we view the evidence in the light most favorable to the verdict, speculation and conjecture alone will not support a verdict.  Because Lymas failed to provide sufficient evidence of proximate cause, the trial judge should have granted Double Quick's motion for a judgment notwithstanding the verdict.

## Conclusion

14

¶36. Lymas failed to present sufficient proof that any alleged negligent omission was the proximate cause of the shooting. Accordingly, we reverse and render judgment in favor of Double Quick. Lymas's cross-appeal is hereby dismissed as moot.

¶37. **ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: DISMISSED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, CHANDLER, AND PIERCE JJ., CONCUR.**